## THE MARIANNE.

Nos. 10, 11, 17, 18, 228.

District Court, E. D. Louisiana.
Oct. 10, 1938.

Bigham, Englar, Jones & Houston, of New York City, and Rosen, Kammer, Wolff & Farrar, of New Orleans, La. (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, and Alfred C. Kammer, of New Orleans, La., of counsel), for libellants.

Monroe & Lemann, of New Orleans, La. (Nicholas Callan, of New Orleans La., of counsel), for respondents Ocean Dominion S. S. Corporation, and Aluminum Co. of America, Inc.

. Terriberry, Young, Rault & Carroll, of New Orleans, La. (Walter Carroll, of New Orleans, La., of counsel), for respondents S. Berg, master, and A/S Nesjar, owner and claimant of the S. S. Marianne.

BORAH, District Judge.

These six admiralty suits all relate to the stranding of the steamer Marianne; they were consolidated and tried together and accordingly may be disposed of in one opinion. In Docket Nos. 10 and 18 the cargo interests are seeking to recover for the physical damage to cargo caused by contact with sea water which entered the vessel. In Docket Nos. 11, 17 and 228 the cargo interests are seeking to recover the payments which they made to satisfy the salvor's liens on the respective shipments of cargo. The sixth action, a. cross-libel, was filed by the master of the Marianne to recover from cargo interests contributions in general average.

By virtue of certain written stipulations and agreements had between counsel at the trial, there are but two principal issues in this case. The questions which arise from these issues are (1) Has the vessel owner, who is claiming the benefit of Section 3 of the Harter Act, 46 U.S.C.A. § 192, satisfied the burden of proof which the law imposes by affirmatively proving that due diligence was exercised to make the vessel "in all respects seaworthy and properly manned, equipped and supplied", and (2) was the vessel guilty of an unjustifiable deviation.

The undisputed facts show that on December 27, 1931, the steamer Marianne was under charter to Ocean Dominion Steamship Corporation, doing business under the trade name Aluminum Line, and was engaged upon a voyage from Gulf ports in the United States to ports in the West Indies. On the aforementioned day she entered the port of Puerto Plata in the Dominican Republic for the purpose .of discharging a small part of her cargo, and at nine o'clock in the forenoon after discharge was finished she left for sea. While proceeding in the charted channel and before getting out to sea the Marianne slowed to drop the pilot, and before she could regain steerageway the current and wind caught her bow and swung her sharply to port and before she could overcome her sheer she ran upon a submerged wreck.

788

After working her engines for fifteen minutes the ship came free from the wreck and put out to sea. Later, after several hours sailing, it was found that she was making so much water that it was deemed necessary to put back into port and beach the vessel to prevent her sinking. This was done and the vessel was beached in the soft mud at the shore end of the wharf at which she had previously discharged cargo. It is quite obvious from the testimony that the cause of the stranding is attributable to the fact that insufficient allowance was made for wind and current. These factors should have been more carefully considered and greater allowance made therefor as the vessel was then down by the stern proceeding at slow speed in close proximity to the charted wreck. Failing under these circumstances was negligence and constituted a fault or error of navigation. It follows that the vessel owner and the Aluminum Line are liable to cargo interests for the consequent damage to the cargo unless they can establish that they are entitled to the exemptions of Section 3 of the Harter Act.

■ To satisfy the condition of the exemption the vessel owner has offered general testimony concerning the good condition of the hull, machinery and navigational equipment of the Marianne, and to show that she carried a full and sufficient complement of duly licensed officers and crew as required by Norwegian law. Favorable testimony was also offered concerning the qualifications of the master, chief officer and helmsman. There is no evidence to the contrary. Consequently, I find no difficulty in reaching the conclusion that the vessel owner and the Aluminum Line are entitled to the exemptions of Section 3 of the Harter Act.

The cargo involved in this litigation was shipped under forty-three bills of lading. Of that number twenty-eight cover cargo shipped on the vessel at New Orleans for carriage to Maracaibo, four cover shipments from New Orleans to Cristobal Colon and the remaining cover cargo consigned to San Pedro de Macoris, Barahona, San Domingo City and Aruba. As will appear from the stipulations on file all of the bills of lading covering the shipments to Maracaibo and Cristobal Colon save one have typed on their faces the clause, "Vessel proceeds via Gonaives, Haiti, Barahona, D. R., and St. Nicholas, Aruba". One bill of lading covering the shipment to Aruba has on its face this typewritten clause,

"Vessel proceeds via Gonaives, Haiti, and Barahona, Dominican Republic", and eight bills of lading covering shipments consigned to San Pedro de Macoris, Barahona and San Domingo have typewritten on their faces this endorsement, "Vessel proceeds via Gonaives, Haiti." It also appears from the testimony that on the voyage in question the Marianne sailed from New Orleans and after calling at Mobile to load additional cargo she called in the order named at Port au Prince, Gonaives, Cape Haitian, Puerto Plata, San Pedro de Macoris, San Domingo, Barahona, Aruba and Maracaibo.

■ While it is undoubtedly well settled that a vessel in the absence of any special contract is under legal obligation to proceed from her ports of loading to the contractual ports of destination of cargo entrusted to her upon the most direct, practical course, it is equally true that a carrier may justify deviation from the most direct practical route by proof of custom or of a contractual liberty to follow the course taken. The issue of deviation, therefore, involves inquiry as to whether or not the evidence in this case supports the conclusion that the Marianne at the time of the stranding was upon her usual and customary voyage.

There are no issues of fact between the parties and the only evidence concerning custom consists of the testimony of the Assistant General Manager of the Aluminum Line, together with certain exhibits which were identified by him and offered in connection with his testimony. This evidence may be summarized as establishing the following: For a number of years up until the year 1920 Page and Jones operated a service which called at Haitian ports; this service was known as the Windward Line. Since the year 1921 no steamship company has been engaged in this service except the Aluminum Line. It was and has been the custom of the Aluminum Line "to operate a combination service to Haitian ports sending alternate vessels to Port au Prince, then to Haitian and Dominion ports on the north side of the Island, and then to San Domingo, the other vessel calling at Port au Prince and Haitian and Dominion ports on the south side of the island, then to San Domingo, the vessels in both services terminating their voyages at Maracaibo, Venezuela". This custom prevailed from the beginning, and for ten years prior to the stranding alternate fortnightly voyages were made to the

north side Haitian ports and to the south side Haitian ports. Throughout this period libellants had been more or less regular customers of respondent, and from the beginning of the service each active and prospective shipper, including those involved in this litigation, was advised of proposed sailings and ports of call by regular advertisements in the Daily Shipping Guide, a publication devoted to maritime news in the Gulf, and by proposed sailing schedules carrying proposed sailings for three months. The sailing schedules and proposed sailing list would include regular ports of call and additional ports when sufficient cargo was offered. Shortly prior to October 1, 1931, a list of proposed sailings through December, 1931, was sent to all regular and potential customers including the shippers herein. And approximately ten days prior to the proposed sailing date at New Orleans the proposed sailing of the Marianne on the northbound Haitian route, including ports of call, was advertised in the Daily Shipping Guide. When sailings included ports other than regular ports of call a clause was placed on the bill of lading specifying that the vessel on that particular voyage would call at the additional port or ports. The witness, when asked to explain the endorsements on the bills of lading, gave this response: "The customary and advertised ports of call on this particular run, which the S/S 'Marianne' took, are as follows: Port au Prince, Haiti, Cape Haitian, Haiti, Puerto Plata, D. R., San Pedro de Macoris, D. R., San Domingo, D. R. and Maracaibo, Venezuela. The ports of Gonaives, Haiti, Barahona, D. R. and San Nicholas, Aruba were extra ports of call not ordinarily included in the customary and advertised routes of this run. The bills of lading covering cargoes destined to ports beyond Gonaives, Haiti, and prior to Barahona, were endorsed to the effect that the vessel was proceeding via Gonaives. On the bills of lading issued to cover cargoes destined to ports beyond Barahona, the bills of lading were claused to the effect that the vessel would proceed via Gonaives, Haiti, Barahona, D. R. and San Nicholas, Aruba."

After giving this explanation the witness then pointed out the number of shipments which were on board for discharge at north side Haitian ports, some of which were made by the shippers involved in this litigation. His testimony also establishes the fact that there is no customary voyage of any vessel destined to Maracaibo, Venezuela, from Gulf ports, via Gonaives, Barahona and San Nicholas, Aruba only.

This evidence is not disputed though its admissibility is challenged in certain respects. Thus it is contended that testimony of any alleged custom or usage of calling at specific ports other than those named in the bills of lading was inadmissible because it was an attempt to vary by parol evidence the expressed written terms of the contracts as evidenced by the bills of lading. This contention is without merit. Ocean bills of lading are usually ambiguous in respect to the fact that they seldom if ever express the complete contract. Where as here the contracts contain no statement of the regular route,—the course of the customary voyage, resort may be had to extrinsic evidence to establish proof of custom and to ascertain the meaning to be accorded to the endorsements on the bills of lading. Parol evidence is always admissible to prove intention in contracts of doubtful meaning. As was said in Marx v. National Steamship Co., D.C., 22 F. 680, which language was quoted with approval in W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, D.C., 7 F.2d 889, affirmed 9 Cir., 12 F.2d 519: "'In construing bills of lading, as in construing other commercial instruments, it is the right and duty of the court to look not only to the language employed, but to the subject-matter, and to the surrounding circumstances, in order to determine the proper effect of the language used, by putting itself, so far as possible, in the place of the contracting parties. It has regard, therefore, to all the prevailing usages and customs of business.'" [page 684]

And as stated by the Court below in W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, supra [page 892]: "The propriety of any particular deviation is a question of fact in each case and there is no fixed rule for such determination. It is a question of inherent reasonableness, and pertinent to the inquiry of the surrounding circumstances, namely, the commercial adventure, which is the subject of the contract, the character of the vessel, the usual and customary route, the natural and usual ports of call, the location of the port to which the deviation was made, and the purpose of the call thereat."

Considering the evidence in the light of these guiding principles, I am persuaded that the evidence in this record supports the conclusion that the Marianne at the

time of the stranding was upon her usual and customary voyage and was not guilty of an unjustifiable deviation.

In the brief of libellants it is conceded that a carrier may justify deviation from the most direct practical route by proof of custom but it is contended that testimony offered to establish the knowledge of shippers of cargo of the course of the Marianne was inadmissible because it varied the terms of a written instrument. It is believed that libellants have mistaken the purpose of this evidence. This testimony was not offered to establish the knowledge of shippers of an intended deviation from the customary route but to prove that the customary route was well known by the shippers involved in this litigation and had been known by them for a period of years. Proof of this character was competent on the issue that custom existed and custom was known. Other special objections urged to the admissibility of evidence have been considered but need not be discussed as the concededly admissible evidence concludes the case in respondents' favor.

Having concluded that the Marianne at the time of her stranding was proceeding on her customary voyage and that she did not in fact deviate from that voyage, there is no necessity for considering the liberty of call clauses in the bills of lading.

In view of the foregoing it follows that the two libels for cargo damage and the three libels to recover payments made to satisfy the salvor's liens should be dismissed and that there should be a decree on the cross-libel in favor of the vessel owner and against the cross-respondents for the general average balances due in accordance with the general average statement. Appropriate decrees may accordingly be entered.