PHILIPP BROTHERS METAL
CORPORATION, Plaintiffs,

v.

SS "RIO IGUAZU", her engines,
boilers, etc.,

v.

EMPRESA LINEAS MARITIMAS AR-
GENTINAS (Argentine Lines) and Pitt-
ston Stevedoring Corp., Defendants.

78 Civ. 1096(PNL).

United States District Court,
S. D. New York.

Sept. 23, 1980.

As Corrected Sept. 26, 1980.

John E. Cone, Bigham, Englar, Jones & Houston, New York City, for plaintiffs.

Enrico S. Sanfilippo, Kirlin, Campbell & Keating, New York City, for Empresa.

Francis J. McCaffrey, Donovan, Maloof, Walsh & Kennedy, New York City, for Pittston.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVAL, District Judge.

Philipp Bros. Metal Corp. ("plaintiff", "shipper" or "owner" of the cargo) brought this action against Empresa Lineas Maritimas Argentinas (the "carrier"), owner of the S.S. Rio Iguazu, and Pittston Stevedoring Company (the "stevedore"), alleging a shortage in a shipment from Buenos Aires to New York of tin bars belonging to plaintiff. The tin bars were placed aboard the Rio Iguazu in Buenos Aires, and discharged by Pittston, the carrier's stevedore, in New York. The carrier and the stevedore filed cross–claims against one another for indemnification.

The ship was discharged in New York by Pittston on November 3 and 4, 1976, and arrival notices were sent to plaintiff as consignee. The plaintiff, not having yet sold the cargo, did not call for it during the free time provided, but instead caused it to be weighed on the pier on November 17 by Pidgeon, an independent weigher, who found and certified all the cargo covered by the bill of lading to be present. During the next two months, the plaintiff sold the cargo and arranged for truckers to pick up the shipment in three separate lots. When the last portion was picked up at the Pittston pier by plaintiff's trucker on January 19, 1977, the trucker found that only 113 bundles remained instead of the 118 bundles which should have been there. Furthermore, it was apparent that rebundling had occurred. A shortage of 2,326 pounds (roughly equivalent to 5 bundles) was confirmed by weighing when this portion of the shipment was delivered by the trucker to Gould, the purchaser of the tin bars.

The purchaser Gould accordingly reduced its purchase payments to the plaintiff by

$10,013.33, the price attributable to the missing cargo. It also billed the plaintiff $910.15 for the extra labor required to weigh the broken, rebundled and incomplete shipment.

### A. The Owner's Claim against the Stevedore

■ I find that the plaintiff succeeded in proving that Pittston by negligence or fraud breached its obligations as bailee and caused the loss.

The evidence demonstrates that Pittston received in its warehouse and held after the expiration of free time the full shipment of 233 bundles, exactly as shown on the ship's manifest.

On the other hand, the proof establishes convincingly that when the freight was picked up by truckers to be delivered at the owner's instructions, less than the full amount of cargo remained. At the time of the final pickup, which occurred on January 19, 1977, there should have been 118 bundles remaining, but only 113 bundles were found. Putting together all of the shipments out from Pittston's warehouse, Pittston delivered out only 228 bundles instead of 233. The cargo had disappeared from Pittston's custody while it held the cargo as bailee.

Pittston objects that there is evidence from which the court could infer that Pittston did not receive the full amount of the cargo called for by the manifest. There was testimony by Petrocelli, Pittston's pier manager, that in the hold of the ship the cargo was not properly bundled, that bundles had broken apart, that pieces were floating free, and indeed, an Exception Report was prepared by the clerk in the shed to which this cargo was transported to the effect that the bundles could not be counted because of breakage of packages.

According to Petrocelli's testimony, he was aware from the first of the existence of a possible controversy as to whether all of the merchandise called for by the bill of lading and the manifest came over the rail.

However, at no time did Pittston take any steps to demonstrate that it received less than the full shipment. To the contrary, documents prepared by Pittston are consistent with the full shipment being in its hands. Furthermore, Pittston was well aware that, at the owner's instance, on November 17, the cargo was weighed and certified by Pidgeon. Indeed, Pittston accommodated the weigher by providing him with a forklift and operator. If Pittston had any suspicions, as Petrocelli's testimony suggests it did, it could have supervised or monitored the weighing.

So far as the evidence shows, Pittston did not in any way look in on or advise itself of the conclusions reached by Pidgeon in making his weighing.

Pittston now seeks to cast aspersions on the honesty of the weight taken at that time, but has offered absolutely nothing in evidence to impeach Pidgeon's certifications.

Pittston furthermore could have protected itself by taking a weight and/or count of its own. It did not do so.

In addition Pittston sent a bill to the owner charging demurrage which was based on the proposition that Pittston was in possession of all of the cargo. That was Exhibit 3–B, which billed for 233 bundles of tin bars. While it may well be, as testified to by Weiss, that the demurrage bill was drawn directly from the manifest, nonetheless, Pittston in preparing this bill acted in accordance with a belief that all of the freight was in its hands.[1]

The weighing performed by Pidgeon conclusively established that as of the time that Pittston's role was converted from that of stevedore to the role of warehouseman, Pittston had all of the tin under its roof. But it was not there two months later when the plaintiff sent trucks to pick it up.

---

1. This inference is not undercut by Pittston's later issuance of a reduced bill (Exhibit 3A). That was issued only because plaintiff refused to pay the larger contested bill. Pittston therefore issued a bill for warehousing of the undisputed portion of the bundles in the hope of being paid that amount.

There was still further proof suggesting foul play with respect to the tin which Pittston concealed from the owner. Cottrell testified by deposition, as the representative of Pittston, that Petrocelli, contrary to his own testimony, had ordered the rebundling of plaintiff's tin (or so stated to Cottrell) and further that Petrocelli called in the Waterfront Commission with respect to this matter. Unless Petrocelli believed there had been a theft or other impropriety as to this cargo, it is hard to understand why he would have thought it appropriate to advise the Waterfront Commission merely because of a small shortage as against the shipping documents.

Accordingly, I find that the owner has established liability of Pittston for the breach of Pittston's obligations as a bailee.[2] See I.C.C. Metals, Inc. v. Municipal Warehouse Co., Inc., 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980).

### B. The Owner's Claim Against the Carrier

■ I find that the plaintiff has failed to make out a claim against the carrier for breach of the contract of carriage or liability under either the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. or the Harter Act, 46 U.S.C. § 190 et seq.

The plaintiff's proof showed that the loss was suffered after the carrier had completed constructive delivery of the goods. The weigher issued a certificate which indicated that all of the plaintiff's cargo was available to be picked up by the plaintiff at the pier two weeks after its arrival. The plaintiff does not dispute that the pier was a fit and proper wharf or that the plaintiff was given reasonable notice and a fair opportunity to remove the goods. I therefore find that the carrier discharged its obligations under the contract of carriage. See, e. g., Leather's Best v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971); Caterpillar Overseas,

S.A. v. The Expeditor, 318 F.2d 720 (2d Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963).

The more difficult question, however, is whether and to what extent the carrier's responsibilities to the plaintiff extended beyond the time of constructive delivery while the goods remained on the stevedore's pier.

Although the authorities are in agreement that the Harter Act forbids enforcement of overreaching exculpatory clauses in contracts of carriage which would otherwise serve to permit a carrier to avoid liability for the loss of goods discharged from a ship but not yet delivered to the consignee, see David Crystal, Inc. v. Cunard S. S. Co., 339 F.2d 295 (2d Cir. 1964), aff'g 223 F.Supp. 273 (S.D.N.Y.1963); Caterpillar Overseas, S. A. v. S. S. Expeditor, supra; Isthmian S. S. Co. v. California Spray–Chemical Corp., 290 F.2d 486 (9th Cir. 1961), modified, 300 F.2d 41 (9th Cir. 1962), it is less clear whether a carrier's responsibility for the goods continues after the consignee, given due notice of arrival, has failed to take possession of the goods on the stevedore's pier.

■ After constructive delivery, the carrier cannot simply abdicate all responsibility for the goods. Although perhaps free of responsibilities created by the Harter Act, the carrier in possession of goods not yet called for is liable as a bailee for negligence in the storage of the goods. See The Italia, 187 F. 113 (2d Cir. 1911); Kinderman & Sons v. Nippon Yusen Kaisha Lines, 322 F.Supp. 939 (E.D.Pa.1971); Standard Brands v. Nippon Yusen Kaisha Lines, 42 F.Supp. 43 (D.Mass.1941). But cf. Smith v. Britain S. S. Co., 123 F. 176 (S.D.N.Y.1903). It has been suggested that a carrier could avoid this responsibility through the common provision in bills of lading allowing the carrier to place the goods in an independent warehouse at the expense and risk of the shipper, cf. Leather's Best v. S. S. Morma-

---

**2.** This opinion is not intended to suggest that in every case a stevedore becomes liable for short counts after the expiration of free time, which would pose serious problems for stevedores and expose them to great risks. That proposition is not involved here, because this is not a case of absence of convincing proof as to how much freight was delivered into the stevedore's hands. The weight taken on Nov. 17 establishes reliably that Pittston had the goods in its custody.

*clynx, supra,* 451 F.2d at 807 n.5.  In this case, the carrier did not exercise this option. It left the goods on its stevedore's pier.

█ The question raised by these facts is whether the carrier remained *vicariously* liable for its stevedore's negligence, the stevedore having assumed responsibility and, after the expiration of free time, charged demurrage to the plaintiff for the storage of the goods.

This issue is not answered by the case law in this Circuit.  After trial in *David Crystal, Inc. v. Cunard S. S. Co.,* 223 F.Supp. 273 (S.D.N.Y.1963), *aff'd,* 339 F.2d 295 (2 Cir. 1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965), the district court found that the carrier's post–delivery responsibility as warehouseman for the goods was not affected by the fact that the carrier had delegated responsibility for storage of the goods to its stevedore, and accordingly, the carrier remained vicariously liable for the stevedore's negligence in storage of the goods.  *Id.* at 282.  Without expressly rejecting this analysis, the Court of Appeals affirmed on different grounds. The Court disagreed with the district court's conclusion that a constructive delivery, and a discharge of the carrier's duties under the bill of lading, had taken place. 339 F.2d at 297.  Indeed the cargo in *David Crystal* had been discharged only the previous day when the theft occurred.  The Court of Appeals found that the carrier was responsible as bailee for the discharged goods pursuant to its duties under the bill of lading, and agreed with the trial court that the carrier's responsibilities were not altered by the fact that a stevedore had been hired by the carrier to carry out its warehousing and delivery responsibilities. "Absent a valid contract to the contrary, a bailee remains liable for the safety of the goods in whatever hands he may place them; ...." *Id.* at 298.  The Court, however, added, "[E]xceptions that may arise when a consignee fails to accept the goods have no relevance to this case," citing *The Eddy,* 5 Wall. 481, 72 U.S. 481, 18 L.Ed. 486 (1867)."

In *The Eddy,* the Supreme Court in 1867 considered the liability of a ship which retained cargo upon the consignee's refusal to pay freight without a prior opportunity to inspect the goods at its warehouse.  The district court had granted judgment against the master based on the wharfinger's having wrongfully disposed of the goods.  The Supreme Court noted first that "[W]hen ... goods ... are not accepted by the consignee or the owner of the cargo, the carrier should not leave them exposed on the wharf, but should store them in a place of safety ...." 72 U.S. at 495, 18 L.Ed. 486.  Nonetheless the Court directed judgment for the ship.  However, it made clear that its judgment in favor of the ship was "irrespective of any subsequent misconduct of the bailee" since "none of those questions [were] involved in the pleadings ...." The sole issue on which the decision rests is the right of the ship to retain the goods to secure its lien for unpaid freight. *The Eddy* is therefore not dispositive of the question here raised.

Lower court cases decided subsequent to *David Crystal* appear to be divided on the question of whether a carrier's vicarious liability for the negligence of its stevedore in warehousing goods extends beyond the expiration of free time and the discharge of the carrier's duties under the bill of lading. *Compare Consolidated Cork Corp. v. Jugoslavenka Linijska Plovidba,* 318 F.Supp. 1209 (S.D.N.Y.1970) *with Mitsui & Co. v. Honduras,* 1979 A.M.C. 2880 (S.D.N.Y.1979) (finding carrier liable, but suggesting that result might be different if loss could be assigned to post–constructive delivery period).

In my view, the rule outlined in the opinion of the district court in *David Crystal* and in the *Consolidated Cork* case is more consonant with the policies of modern maritime law to insure that unequal bargaining positions do not lead to an unequitable allocation of risk. *See, e. g., Caterpillar Overseas v. S. S. Expeditor, supra,* 318 F.2d at 722.  Just as the carrier is in a better position than the owner of the goods to assess and ensure against the risk of loss before "constructive delivery," the carrier is also in a better position than the owner of

the goods to assess the reliability of its stevedore and to protect itself by contract (as well as by its mutually beneficial continuing business relationship with the stevedore) and by insurance against cargo losses taking place when the goods are in the stevedore's possession. Empresa, the carrier in this case, calls regularly at the Port of New York, and regularly employs Pittston as its stevedoring and warehousing agent under a long term contract. At least where these circumstances are present, the carrier should remain responsible to the owner for the negligence of its stevedore in the execution of the stevedore's duties as bailee, even after expiration of free time.

It is true that the equities in this case do not particularly favor the owner. Philipp Bros. is an enormous commercial organization, perfectly capable of dispatching agents to see to the prompt collection, safeguarding and insurance of its cargo. But all consignees of cargo are not such. Many are distant from, and unfamiliar with the ways of, the port. For such consignees, a failure to collect cargo within a few days of arrival hardly seems the kind of reprehensible dereliction which should deprive them of a remedy against the carrier when their cargo has been lost or stolen by the carrier's stevedoring agent. The fact that the owner would have a cause of action against the stevedore does not seem sufficient reason to deprive him of rights against the carrier to whom he or his assignor entrusted the cargo. And if the ultimate liability falls on the stevedore, the carrier is in a far better position to collect it than the owner of the cargo.

I conclude that the carrier Empresa is liable to the plaintiff by reason of Pittston's dereliction in the safekeeping of the cargo.

*Cross–Claims Between the Co–Defendants*

For the reasons stated below, I find no merit in any of the co–defendant's cross–claims.

### Pittston v. Empresa

First, Pittston claims that Empresa is responsible under the stevedoring contract,

Paragraph VI(2)(b), to assume liability for all disappearances of cargo except when occasioned by fraud or negligence on the part of Pittston's employees. Since the evidence showed either negligence or fraud on the part of Pittston's employees, Pittston's reliance on this clause fails.

Pittston additionally claims that Empresa should indemnify Pittston for its liability because Empresa breached its contract with Pittston in granting plaintiffs an extension of time to sue.

This claim is inapposite. The liability here imposed upon Pittston does not derive from the extension granted by Empresa. It derives from Pittston's conversion or negligent bailment of the plaintiff's goods. The one year time bar contained in the bill of lading applied to suits asserting liabilities arising under the bill of lading. The present liability arises not from conduct under the bill of lading but from subsequent conduct. Pittston would have been held liable regardless of Empresa's grant of extension.

In any event Pittston did not show that it was damaged by Empresa's grant of an extension. The extension was granted within the time for suit to attempt to settle the matter without litigation. Had the extension not been granted, the suit would have been brought within the time allowed. Pittston has demonstrated no loss or disadvantage which it suffered from the delay.

Finally, Pittston claims Empresa breached Paragraph VI(2)(d) of the stevedoring contract. That provision entitled Pittston to notice when Empresa issued a declared–value bill of lading, as opposed to one governed by the standard $500 package limitation. This claim also is inapposite. The evidence on this subject was somewhat murky, but Pittston failed to show that the bill of lading was ad valorem. I find that the bill of lading was governed by the package limitation clause.

### Empresa v. Pittston

Empresa cross–claims against the stevedore for indemnity as to any liability in-

curred by the carrier based on the stevedore's misconduct. Although Pittston should bear the responsibility for the loss caused by the breach of its duties as bailee, Empresa is time–barred from asserting the claim under the provisions of its stevedoring contract with Pittston. See opinion rendered December 21, 1979, on motions for summary judgment. Accordingly the cross–claim of Empresa is dismissed.

### Damages

Pittston and the Empresa are jointly and severally liable to plaintiff for a shortage of 2,326 pounds, of a value of $4.305 per pound making a total of $10,013.33.

 I reject the argument that the $500 per package limitation clause requires a limitation of their liability. It is the carrier's (or stevedore's) burden to establish facts showing that this clause should result in a limited judgment. They have not so demonstrated. Evidence showed that bundles had broken and that rebundling had occurred. It was not shown how many bundles had broken. The shortage was shown to be of 2,326 pounds, or the equivalent of approximately five bundles, and the final count of bundles was five less than it should have been. But there was no showing that the lost cargo came from only five bundles. Indeed the proof was to the contrary since the clean disappearance of five bundles would not have involved the breaking of other bundles or their rebundling. Plaintiff would be entitled to recover his full loss from any single bundle, so long as it did not exceed $500. Defendants failed to show that the lost cargo emanated from less than 22 of the 233 bundles shipped. It has accordingly not been shown that the judgment of $10,923.48 would exceed the $500 per package limitation.

In addition Pittston and Empresa are liable to plaintiff for the charge of $910.15 imposed on Philipp Brothers by its customer Gould for the weighing and the extra work required in ascertaining the loss. This makes a total of $10,923.48.

On the other hand, Pittston has demonstrated entitlement to be paid its demurrage charges for 228 bundles, in the amount of $2,867.04.

Submit judgment.