GOYA FOODS, INC., Plaintiff,
v.
S.S. ITALICA, S.S. Americana, their engines, boilers, etc., In Rem, and Italia S.p.A. di Navigazione, Defendants.

No. 78 Civ. 2912 (JEL).

United States District Court,
S.D. New York.

April 13, 1983.

ally destroyed all of the pimientos as unfit for human consumption. Goya attributes the decomposition of the pimientos to freezing damage, and claims that the pimientos froze because Italia Lines stowed them improperly and deviated from the transatlantic route the parties had agreed upon. Goya, invoking admiralty jurisdiction, 28 U.S.C. § 1333(1) (1976), seeks damages of $108,413.88.[1] Goya's claim was tried to the court between November 8th and 10th, 1982. The court finds that Italia Lines' vessels did not deviate from their customary routes and that Goya has not otherwise proven its case under the governing statutes, and accordingly directs the entry of judgment for Italia Lines.

Goya, a food processor and distributor, has imported pimientos from Spain for many years. In June, July, and November, 1976 Goya agreed to purchase from Conservas Hispamer, S.A., a Spanish food packager, 12,088 cartons of pimientos to be shipped "Cost & Freight" between September and December, 1976. The purchase price thus included the cost of carriage arranged by Conservas. Conservas packaged the pimientos for Goya in autumn, 1976 at its plant near Jumilla, Spain.

Enrique Cedeno Querra, Conservas's general manager, testified by deposition to the quality control procedures which Conservas ordinarily employs and which it applied to Goya's consignment. During the packaging process the pimientos are inspected several times, the jars are washed and sterilized, and the pimientos' temperature and acidity (PH) is carefully monitored. In order to exclude air and prevent spoilage, the pimientos are vacuum-packed in jars with deflection caps which pop up if the vacuum is lost. A jar in which the cap has deflected upward is called a "springer." Before shipping a consignment of pimientos Conservas inspects each carton for springers and removes any that are found. Conservas designs its packaging and inspection procedures to conform to both Spain's and the importing country's health regulations.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy by Timothy D. Ford, New York City, for plaintiff.

Michael D. Martocci, New York City, for defendants.

## OPINION

LUMBARD, Circuit Judge: *

Plaintiff Goya Foods, Inc., was the purchaser and consignee of 12,088 cartons of pimientos shipped from Spain to New York in the winter of 1976–77 aboard two vessels owned and operated by the defendant, Italia S.p.A. di Navigazione (Italia Lines). Soon after Goya took possession of the cargo in New York, it became apparent that some of the pimientos had been damaged and had begun to decompose. Goya eventu-

* Sitting by designation.

1. Goya requests $94,658.08 for the cost of the pimientos, $9,465.80 for lost profits, and $4,290.00 for handling and dumping expenses.

Conservas contracted with Italia Lines for shipment of Goya's pimientos. In December, 1976 Italia Lines delivered five shipping containers to Conservas at its plant. Conservas packed three of the containers with a total of 7,240 cartons of pimientos stacked in pallets. Each carton, depending on jar size, contained 12 to 24 four ounce, six and one-half ounce, or twelve ounce, jars of pimientos. Truckers hired by Italia took the three containers to Alicante where, on December 15 and 16, 1976, they were laden on board Italia Lines' container ship, the S.S. Americana. Conservas packed the remaining two containers with 4,848 palletized cartons of pimientos. Italia Lines' truckers transported the final two containers to Valencia where, on December 31, 1976, they were laden on board the Americana's sister ship, the S.S. Italica. Italia Lines issued clean bills of lading for all five containers. Additionally, before the ships were loaded, a Spanish governmental agency known as "Servicio Official de Inspeccion, Vigilancia y Regulacion de las Exportaciones (SOIVRE, or "Official Exports Inspection Surveillance and Regulation Service"), inspected pimientos in each of the five containers to insure that they were edible and in conformity with United States regulations. SOIVRE approved the export of all of the pimientos.

Neither party has presented direct evidence of where Italia Lines stowed the pimientos. However, Italia Lines, which has failed to produce the Americana's and the Italica's stowage plans, concedes that the containers were stowed on deck. The containers that Italia Lines provided to Conservas could not be heated during the voyage across the Atlantic. Although heated shipping containers are available for a higher charge, Conservas never requested, and Italia Lines never suggested that Conservas use, such containers. The ordinary practice in the trade is to use unheated containers. Although the bills of lading issued by Italia Lines listed only New York as the port of discharge and did not identify any other ports to be visited during the voyages, paragraph 3 of the bills of lading did authorize the ships to stop, *inter alia*, at their "usual or customary or advertised ports of call."

The Americana departed from the Mediterranean on January 2, 1977, and arrived at Saint John, New Brunswick on January 8, at Boston on January 9, and at New York on January 12. On either January 12 or 13 the Americana discharged its three containers of pimientos onto an open, unheated pier operated at Weehawken, New Jersey by Italia Lines' United States agent, Seatrain Agencies, Inc. Goya had notice of the Americana's arrival because its documentation clerk, Joseph Perez, had repeatedly called Italia Lines' New York office about the vessel's progress. Goya's truckers picked up one container on January 14, another on January 17, and the final container on January 20, and drove the containers six miles to Goya's heated warehouse at Secaucus, New Jersey. Temperatures frequently fell below freezing during the period between discharge and Goya's pick-up of the final container. Although the Weehawken pier had facilities to heat discharged cargo, Italia Lines neither instructed, nor did Goya request, Seatrain to heat the containers.

The Italica left the Mediterranean on January 17, 1977, and arrived at Saint John on January 23, at Boston on January 24, and at New York on January 25. The Italica discharged both of its containers of pimientos onto the Weehawken pier shortly after arrival. Goya, through Perez, had notice of the Italica's arrival and discharge of cargo. Goya's truckers picked up the Italica's two containers on February 3 and transported them to the Secaucus warehouse. Seatrain did not heat the containers during the interval between discharge and pick-up.

The Food and Drug Administration (FDA) inspected both the Americana and the Italica's pimientos and cleared them for import. On February 1 and 14, Goya paid Conservas by letters of credit which had made FDA approval of the pimientos a condition of payment.

When the containers arrived at its warehouse, Goya removed the pallets of pimien-

tos and stacked them in the center of the building. Goya maintained a temperature of approximately 60 degrees in the warehouse. The cartons of pimientos, when removed from the containers, appeared to be sound and without external damage. However, in late January, 1977, warehouse employees noticed puddles of liquid forming underneath some of the stacked pallets. Upon opening some of the cartons, Goya found that a number of jars had become springers and were leaking fluid, and that the contents of other jars were frozen. Goya communicated its findings to Italia Lines, the FDA, and its cargo underwriter, Talbot, Bird & Co. On February 9 Robert Louis of Talbot, Bird & Co. and a Mr. Krawchuk of Italia Lines jointly surveyed the cargo. Louis and Krawchuk found that the vacuum seals on many of the jars from both the Americana and Italica shipments had broken, that some jars were leaking fluid, and that some of the pimientos had decayed. They recommended to Goya that it attempt to segregate the sound portion of the cargo from the bad. On February 10 Goya sent Italia Lines a notice of claim for the full value of all five containers of pimientos, stating in its notice that the pimientos had arrived in a " 'freeze-damage' condition."

Between February 14 and March 15 Goya segregated 885 cartons of totally damaged pimientos. On February 17 Inspector James Blumenstock of the New Jersey Department of Health conducted an annual inspection of the Goya warehouse. Inspector Blumenstock examined the pimientos, made note in his report of the broken seals, leakage, and decay, and placed the entire cargo under embargo pending the completion of segregation. Under the embargo Goya could not sell the pimientos or remove them from the warehouse without permission from the Department of Health. In late February or early March the Department of Health took seven samples for testing from jars that Goya had segregated as apparently sound. The Department's tests found four samples to be sound; but found three samples, including two that were discovered to contain mold, to be unsatisfac-

tory. In March, Goya applied for and received from the Department permission to destroy the 885 cartons of pimientos segregated as totally damaged. On March 29 Goya removed the 885 cartons from its warehouse, crushed them and dumped them in a landfill.

At Goya's request, the FDA in April agreed to reinspect the remaining pimientos. On April 29 Goya shipped the FDA 560 jars for testing. On June 8 the FDA informed Goya that its tests had revealed "a potential problem with bacterial contamination" and ordered Goya not to distribute the pimientos pending final evaluation of the test results. On June 14 Goya requested the FDA to issue final rejection notices for all of the pimientos. Goya told the FDA that it felt that "the problem of bacterial contamination is too great a risk to take, not only for our company name, but, also for our loyal consumers." Thereafter, between June 17 and June 22, Goya received from the FDA final refusals of admission covering all of the pimientos. The FDA notices stated that the pimientos had been found to be in violation of § 801(a)(3) of the Food, Drug, and Cosmetic Act, indicated that the pimientos had to be either exported or destroyed, and informed Goya of its right to take an administrative appeal. Goya did not appeal.

The pimientos were also tested in June by Jacobs-Winston Laboratories, Inc., which received 14 samples of pimientos from Robert Louis of Talbot, Bird & Co. Louis took the samples on June 3 both from apparently sound and from visibly damaged cartons. On June 10 Jacobs-Winston reported that half of the 14 samples were acceptable, and half were unacceptable due to decomposition. Jacobs-Winston's report stated that weakening of the vacuum seals on the jars was a major factor behind the decomposition.

On July 25 United States Customs, and on July 28 and 29, the New Jersey Department of Health, authorized Goya to destroy all of the pimientos not previously destroyed, and Goya immediately did so. Until they were destroyed, the pimientos ex-

hibited increasing damage. By July 29 many of the jars had lost all of their fluid, and the pimientos in those jars, and in many others, were badly decayed. However, a significant number of the jars destroyed on July 29 still appeared to be sound.[2]

Goya contends that the pimientos were damaged by freezing caused by Italia Lines' (1) failure properly to stow the pimientos and (2) northward deviations from the direct transatlantic route to New York. These contentions will be considered in order.

The evidence fully supports Goya's claim that the pimientos froze. Marvin Winston of Jacobs-Winston Laboratories, Inc., who tested the samples submitted to his laboratory by Robert Louis, testified that the damage to the pimientos could have been caused by freezing. He explained that expansion of the liquid in the jars during freezing, followed by a thaw, would weaken or break the vacuum seals on the jars and allow air to reach the pimientos. The air entering the jars, would, in turn, cause the pimientos to decay. Winston stated that weakened seals might not break immediately upon thawing, but might break at later times impossible to predict. The progressive deterioration of Goya's cargo over several months is consistent with a theory of delayed breakage of weakened seals. Robert Louis, on the basis of his observations of the pimientos and his experience as a cargo surveyor, gave his opinion that the pimientos were damaged by freezing. Joseph Perez testified that in late January, 1977, when Goya first opened some of the cartons to investigate leakage, he observed that some jars were still frozen. Finally, the court notes no inconsistency between freezing damage and the cartons' apparently sound condition when they were first stacked in Goya's heated warehouse. That is, if the pimientos were frozen when Goya picked them up, the cartons would initially have appeared sound and would not have exhibited damage until the heat in the warehouse had thawed some of the jars. In contrast, if, as Italia Lines suggests, physical shock rather than freezing weakened the jars' vacuum seals, some damage should have been apparent when Goya first removed the cartons from the containers.

■■■ Goya claims that the pimientos froze because Italia Lines negligently stowed the containers on deck when they should have been stowed below deck. Goya's right to recover on this claim is governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300–15 (1976) (COGSA), both because the pimientos were shipped in foreign commerce to a port of the United States, see 46 U.S.C. § 1312, and because the bills of lading issued by Italia Lines explicitly incorporated COGSA into the parties' contract. A shipper or consignee establishes a prima facie case under COGSA if it shows that the cargo was delivered in good condition to the carrier but was in damaged condition when discharged. *Nissho-Iwai Co. v. M/T Stolt Lion,* 617 F.2d 907, 912 (2d Cir.1980); *Vana Trading Co. v. S.S. "Mette Skou,"* 556 F.2d 100, 104 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).[3] The court finds that Goya's proof, though sufficient to establish the first element of a prima facie case, does not show that the pimientos were discharged in a damaged condition. The court accordingly holds that Goya has not made out a prima facie case.

■■■ Proof of delivery in good condition, as such, is unnecessary when the shipper or consignee sufficiently shows that the nature of the damage suffered indicates that the damage occurred after delivery of the cargo to the carrier. *See Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 355

---

**2.** Italia Lines claims that Goya needlessly destroyed all of the cargo when a significant portion could have been saved. The court's decision makes it unnecessary to address this issue.

**3.** A plaintiff need not prove fault on the part of the carrier, or "explain how the damage might have occurred," to establish a prima facie case. *Nissho-Iwai Co. v. M/T Stolt Lion,* 617 F.2d 907, 912 (2d Cir.1980). Thus Goya, to establish its prima facie case, is not required to prove its theory that negligent stowage caused the freezing damage.

(2d Cir.1981). The court's conclusion that the pimientos froze establishes that the damage Goya complains of occurred after Italia Lines received the cargo. Senor Cedeno of Conservas Hispamer stated at his deposition that below-freezing temperatures are extremely rare in the area of southern Spain in which Conservas's factory and the ports of Alicante and Valencia are located. Cedeno stated that he could remember freezing temperatures in the vicinity of his factory only in 1952 and 1969. Italia Lines does not challenge Cedeno's observations on weather. Thus the freezing damage could have occurred only *after* delivery of the pimientos to Italia Lines. Additionally, the stringent quality control procedures, discussed above, that Conservas uses to insure that none of its jars of pimientos are "springers," together with SOIVRE's inspection of individual cartons at the docks and its approval of all five containers for export, strongly suggest that the jars were properly sealed when they were laden on board ship. Italia Lines apparently had no opportunity to open the containers and inspect the cartons before issuing bills of lading. Therefore the court, in finding that Goya has proven the first element of a prima facie case, does not rely upon Italia Lines' issuance of clean bills of lading. *See Id.,* 647 F.2d at 352.

The second element a plaintiff must prove to make out a prima facie case is discharge of the goods in a damaged condition.[4] In any COGSA action, the "plaintiff has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.'" *Id.,* 647 F.2d at 351 (quoting *Pan-American Hide Co. v. Nippon Yu-sen (Kabushiki) Kaisha,* 13 F.2d 871, 871 (S.D.N.Y.1921)). Accordingly, even where a plaintiff has shown delivery in good condition, proof of discharge in a damaged condition "is essential to establish a case of prima facie liability." *Otis McAllister Export Corp. v. Grancolombiana (New York), Inc.,* 216 F.Supp. 756, 757 (E.D.La.1963) (footnote omitted). If the plaintiff fails to make such proof, so that it appears as likely as not that the damage complained of occurred after discharge, the defendant prevails. *See Associated Metals & Minerals Corp. v. M/V Rupert de Larrinaga,* 581 F.2d 100 (5th Cir.1978); *Miami Structural Iron Corp. v. Cie Nationale Belge de T.M.,* 224 F.2d 566 (5th Cir.1955); *Dorsid Trading Co. v. S/S Fletero,* 342 F.Supp. 1 (S.D.Tex.1972); *F. Badrena E. Hijo, Inc. v. The Rio Iguazu,* 182 F.Supp. 885, 891–92 (E.D.La.1960); *Schuyler v. Cunard S.S. Co.,* 1967 A.M.C. 896 (Civ. Ct.N.Y.C.). The damage complained of here is as likely to have occurred after discharge as before.

The Americana arrived in New York on January 12 and discharged its three containers of pimientos on either that day or the next. Goya picked upon one of the containers on January 14. Although John Lyons, Goya's Director of Purchasing, testified that Goya normally picks up cargo within one day of discharge, Goya did not pick up the second container until January 17 and the third until January 20. While the containers stood on the open pier ready for pick-up they were neither heated nor covered. Temperatures at the port averaged 16° on January 12, 18° on January 13, 24° on January 14, 23° on January 15, 17° on January 16, 6° on January 17, 9° on January 18, 19° on January 19, and 29° on

---

4. Section 3(6) of COGSA, 46 U.S.C. § 1303(6), provides that failure by the consignee to give notice of damage to the carrier at or near the time of delivery is prima facie evidence of delivery in good condition. If the damage is not apparent, notice must be given within three days of delivery. Goya did not notify Italia Lines of the damage to the pimientos until February 10, twenty-one days after pick-up of the last of the Americana containers and seven days after pick-up of the Italica containers. Goya's failure to give timely notice requires it to rebut the prima facie defense of good delivery. *M.W. Zack Metal Co. v. The S.S. Birmingham City,* 291 F.2d 451, 453 (2d Cir.1961). Goya has done so by presenting evidence that the damage could have occurred prior to discharge, *see infra,* and thus has created a fact issue which the court must resolve. *See Socony Mobil Oil Co. v. Texas Coastal & Intl., Inc.,* 559 F.2d 1008, 1012 (5th Cir.1977); *C. Itoh & Co. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 597–98 (S.D.N.Y.1979).

January 20. The Italica arrived in New York on January 25 and discharged its two containers of pimientos within one day of arrival. Goya picked up both containers on February 3. Temperatures averaged 34° on January 25, 29° on January 26, 27° on January 27, 29° on January 28, 7° on January 29, 14° on January 30, 16° on January 31, 25° on February 1, 26° on February 2, and 29° on February 3.

Jarred pimientos are packed in brine and therefore have a freezing point below that of water. Neither party, unfortunately, has presented relevant evidence of what that freezing point actually is. It seems probable, however, that temperatures on the pier, particularly during the periods of severe cold between January 16 and 18 and January 29 and 31, fell low enough to freeze cargo from both the Americana and the Italica.

Goya argues that the pimientos froze not on the pier but on board ship. Goya's expert on weather and ship routing, Robert Raguso, presented a chart that showed both the probability of encounter-

ing below-freezing temperatures in January at any given point in the North Atlantic, and the route he believed the Americana and the Italica had taken from Spain to Saint John. Raguso's chart indicated that the Americana and the Italica could have encountered freezing temperatures from longitude 44° W until they arrived in Saint John at longitude 66° W. The defense rebutted Raguso's testimony with the testimony of Captain Nicholas Arena, who in 1977 served as Italia Lines' Owner's Representative in New York.[5] Arena testified that Italia Lines vessels crossing the Atlantic to Saint John in winter in fact take a route far to the south of that assumed by Raguso. Arena drew the vessels' approximate route on a copy of Raguso's chart. If they took the route indicated by Arena, the Americana and the Italica likely encountered freezing temperatures only from longitude 61° W until arrival in Saint John, and during the passage from Saint John to New York. The court finds Arena's testimony credible and accepts it as the best evidence of the route actually taken.[6] Even

---

**5.** The pre-trial order listed Robert Raguso as a plaintiff's witness, but did not list Raguso's weather chart among the exhibits. Italia Lines informed Goya only four days prior to trial that Captain Arena, who was not listed in the pre-trial order, might be called as a witness. The court received Arena's testimony, reserving to Goya its right to move to exclude. Goya now argues that Arena's testimony, except that portion offered to rebut Raguso's weather chart, should be stricken.

Although the court certainly has power to exclude the testimony of a witness not listed in the pre-trial order, see, e.g., Davis v. Marathon Oil Co., 528 F.2d 395, 403–04 (6th Cir.1975), cert. denied, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); Newsum v. Pennsylvania R. Co., 97 F.Supp. 500, 502 (S.D.N.Y.1951), the court declines to apply sanctions here. Arena did not testify to specific facts concerning the Americana's and Italica's voyages, but only to the routes generally followed by Italia Lines' vessels and the nature and number of past claims for freezing damage made against Italia Lines. Goya did not ask for a continuance to reply to Arena's testimony and has not shown surprise from the testimony. Robert Tambini, an employee of Italia Lines' present United States agent, identified Arena at his deposition taken by Goya in 1979. Goya thus had, prior to trial, knowledge of Arena's identity and his position with Italia Lines. The court sees no

such prejudice or unfairness to Goya as to require exclusion of Arena's testimony.

**6.** Goya requests the court to draw an adverse inference against Italia Lines because, it says, Italia Lines disobeyed Magistrate Gershon's order, entered in a conference held on December 23, 1980, to turn over the Americana's and the Italica's rough and smooth navigation logs. Those logs would have shown both weather conditions and the vessels' daily positions during the voyages. Neither party presented evidence from such logs at trial. On the basis of the parties' post-trial submissions, however, the court finds that Italia Lines did provide Goya with copies of the Americana's logs for the voyage in question, and possibly with a computer print-out of the Italica's route. The court believes that defense counsel made a good-faith effort to obtain the logs from the Italian governmental agency which had possession of them, and notes that Goya did not make use of those logs it did receive. The court therefore does not view Italia Lines' failure to provide complete logs as supporting an adverse inference on routes.

Goya also argues that adverse inferences should be drawn from Italia Lines' failure to produce for depositions the masters and/or the chief officers of the Americana and the Italica for the voyages in question. Magistrate Ger-

along the southern route, however, the ships almost certainly encountered below-freezing temperatures during the approach to Saint John, and temperature records submitted by Goya reveal below-freezing temperatures in both Saint John and Boston during both vessels' stops in those ports. It therefore is quite possible that the pimientos froze while on board ship. The court is, however, unable to say that the pimientos *more likely* froze on board ship than on the pier. The temperatures recorded in Saint John and Boston are comparable to those later encountered at the pier in New Jersey, and the Americana and the Italica, in approaching Saint John and in traveling from Saint John to New York, spent no more time in freezing temperatures than the majority of the containers later spent while standing on the pier.[7] Since Goya failed to show that the pimientos more likely than not froze while on board ship, Goya has not proven discharge in a damaged condition and has not established a prima facie case under COGSA.

The court's conclusion that Goya cannot recover under COGSA does not necessarily absolve Italia Lines of liability. If a carrier negligently discharges cargo at the port of destination, it may be held liable for the consequences under the Harter Act, 46 U.S.C. §§ 190–96 (1976), which applies to the period between discharge of the cargo and its proper delivery. *Caterpillar Overseas, S.A. v. S.S. Expeditor,* 318 F.2d 720, 723 (2d Cir.), *cert. denied,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); *British West Indies Produce, Inc. v. S/S Atlantic Clipper,* 353 F.Supp. 548, 550 (S.D.N.Y. 1973). Proper delivery is made when the

carrier places the cargo upon a fit wharf at the port of destination. *Levatino Co. v. American President Lines, Ltd.,* 337 F.2d 729, 729 (2d Cir.1964). Although the bills of lading issued by Italia Lines disclaim all responsibility for providing heating facilities at the discharge pier, Section 1 of the Harter Act, 46 U.S.C. § 190, invalidates any provision in a bill of lading that disclaims liability for failure to make proper delivery. *Id.,* 337 F.2d at 730; *David Crystal, Inc. v. Cunard S.S. Co.,* 339 F.2d 295, 297 (2d Cir. 1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965). Accordingly, the bills of lading cannot protect Italia Lines if the discharge of the freezable pimientos onto an open, unheated pier in New Jersey in January was not a proper delivery.

A number of cases have found improper delivery where a carrier discharged freezable cargo onto an open pier in cold winter weather and freezing damage resulted. *See Levatino Co., supra,* 337 F.2d 729 (2d Cir.1964) (cargo of chestnuts); *British West Indies Produce, Inc. v. S/S Atlantic Clipper,* 353 F.Supp. 548 (S.D.N.Y.1973) (yams); *Monsieur Henri Wines, Ltd. v. S.S. Covadonga,* 1965 A.M.C. 740 (D.N.J.1964) (wine); *Wines of France, Ltd. v. Compagnie Generale Transatlantique,* 1939 A.M.C. 9 (S.D.N.Y.) (wine). In each of these cases, however, the carrier had notice from (1) the nature of the cargo, (2) freezing damage suffered by similar cargo in the past, or (3) its knowledge that the consignee could not make immediate pick-up, that the cargo might suffer damage if discharged onto an unheated pier. None of these factors is present here. Jarred pimientos, unlike

---

shon ordered Italia Lines to produce those persons. Italia Lines has not given a convincing explanation for its failure to do so. From Italia Lines' failure to produce the masters and chief officers the court draws inferences that the pimientos were stowed on deck (a point Italia Lines concedes in its post-trial brief), and that Italia Lines took no steps to prevent freezing during the voyages or during discharge.

**7.** Goya has not proven damage to the first of the Americana containers to be picked up. Although Joseph Perez, and Goya's Director of Purchasing, John Lyons, both testified that

leakage was observed one to two days after placement of the cargo in Goya's warehouse, the court believes that both men's testimony refers to a date one to two days after the arrival and unstuffage of the *last* of the Americana containers. The tests conducted by the New Jersey Department of Health and Jacobs-Winston Laboratories suggested that a significant portion, perhaps half, of the cargo had not been damaged. That undamaged portion may well have included the pimientos in the first Americana container.

chestnuts or yams, do not freeze easily, but freeze only if exposed to severe cold for an extended period. Thus Italia Lines' discharge of the pimientos in cold or freezing weather, in and of itself, would not endanger the cargo. *Compare Levatino Co.*, 337 F.2d at 729–30; *British West Indies Produce*, 353 F.Supp. at 552. Goya does not contend that carriers ordinarily discharge containerized pimientos onto heated piers, or heat such containers once discharged. Instead, Italia Lines' discharge of the containers onto an unheated pier conformed to industry practice. That practice, so far as the evidence shows, has never before resulted in freezing damage to discharged pimientos. Finally, Goya usually picks up cargo within one day of discharge. If Goya had adhered to that practice with respect to the present shipments, the pimientos could not have frozen at the pier. The court finds that Italia Lines had no reason to anticipate freezing damage and that if the pimientos did freeze at the pier, they did so because Goya failed timely to call for them. Italia Lines made proper delivery.

■ Once proper delivery has been made, the provisions of the Harter Act no longer apply. *F.J. Walker, Ltd. v. Motor Vessel "Lemoncore,"* 561 F.2d 1138, 1143 (5th Cir.1977); *Isthmian S.S. Co. v. California Spray-Chem. Corp.*, 300 F.2d 41, 43 (9th Cir.1962); *Morse Electro Products Corp. v. S.S. Great Peace*, 437 F.Supp. 474, 486–87 (D.N.J.1977). *See Philipp Bros. Metal Corp. v. S.S. "Rio Iguazu,"* 498 F.Supp. 645, 648 (S.D.N.Y.1980), *aff'd in part, rev'd in part*, 658 F.2d 30 (2d Cir.1981). Although proper delivery thus ends "(t)he liability of the carrier as carrier," *The Italia*, 187 F. 113, 114 (2d Cir.1911), it does not negate the carrier's responsibility safely to store the cargo until the consignee comes to remove it. Instead, a "carrier in possession of goods not yet called for is liable as a bailee for negligence in the storage of the goods," *Philipp Bros. Metal Corp.*, 498 F.Supp. at 648, and must answer for damage caused by its own negligence or that of a stevedore acting as its agent. *David Crystal, Inc. v. Cunard S.S. Co.*, 339 F.2d 295, 298 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct.

1339, 14 L.Ed.2d 271 (1965). Here, Italia Lines made proper delivery of the pimientos and placed them in the hands of its agent, Seatrain Agencies, Inc. If the pimientos froze because of negligence by Seatrain occurring prior to the time that Goya took delivery, Italia Lines might be liable. Goya, however, does not allege that Seatrain was negligent.

Finally, Goya argues that Italia Lines is liable because, it says, the Americana and the Italica unreasonably deviated from the agreed-upon transatlantic route. *See* 46 U.S.C. § 1304(4). Goya claims that Conservas Hispamer contracted for carriage of the pimientos from Spain directly to New York, and that Italia Lines' ships deviated from the proper route in stopping first at Saint John and Boston.

■ The court finds that no deviation occurred. The bills of lading, it is true, listed New York as the only port of call. However, stops at a vessel's customary ports of call, whether or not the bills of lading list those ports, cannot constitute deviations so long as the carrier has made those stops known to the shipper or the shipping community generally through advertisement, publication, or other means. *See The Marianne*, 24 F.Supp. 786 (E.D.La. 1938); *Philippine Refining Corp. v. United States*, 29 F.2d 134 (E.D.N.Y.1928); *The Frederick Luckenbach*, 15 F.2d 241 (S.D.N. Y.1926). *See also Hostetter v. Park*, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568 (1890). Captain Nicholas Arena, in 1977 Italia Lines' Owner's Representative in New York, testified that in 1975 Italia Lines' customary route from Spain to New York included stops in Halifax, Nova Scotia and Boston, and that in both 1976 and 1977 the customary route included stops in Saint John and Boston. Arena testified that those routes were widely published in trade publications in Spain and the United States. As Goya stresses, Italia Lines has not supported Arena's testimony with documentary evidence. However, Goya has presented no evidence to show that Arena's testimony is inaccurate, or that Italia Lines misrepresen-

ted to Conservas that the ships would proceed directly to New York. The court concludes that the Americana and the Italica proceeded along their customary routes, and that Goya and Conservas knew or should have known of those routes.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Judgment for the defendant.

SO ORDERED.