UNITED STATES STEEL INTERNA-
TIONAL, INC., Plaintiff,

v.

M. T. GRANHEIM, Antilles Shipping
Co., Ltd., P. R. Granheim,
Defendants,

v.

P. R. GRANHEIM, Defendant and
Third-Party Plaintiff,

v.

GATX TERMINALS, Third-Party
Defendant.

No. 79 Civ. 6254 (WCC).

United States District Court,
S. D. New York.

June 16, 1982.

Bigham, Englar, Jones & Houston, New
York City, for plaintiff; William R. Connor,
III, Helen M. Benzie, New York City, of
counsel.

Walker & Corsa, New York City, for de-
fendant and third-party plaintiff P/R Gran-
heim; Hollis M. Walker, Jr., William J.
Blumenschein, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant Antilles Shipping Co., Ltd.; Robert J. Giuffra, New York City, of counsel.

Vincent, Berg, Russo, Marcigliano & Zawacki, New York City, for third-party defendant GATX Terminals; Alfred J. Will, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff United States Steel International, Inc. ("USS") seeks to recover damages arising from the discoloration of a cargo of alpha methyl styrene ("AMS") during a voyage from Houston to Rotterdam. USS shipped 1,299.48 metric tons of AMS pursuant to a tanker voyage charter party with defendant Antilles Shipping Co., Ltd. ("Antilles"). Antilles was the time charterer of the chemical tanker M. T. Granheim, which is owned by defendant P. R. Granheim ("Granheim"). The case was tried by the Court without a jury; this opinion constitutes the Court's findings of fact and conclusions of law. Rule 52, F.R.Civ.P.[1]

*Background*

AMS is a colorless liquid that is produced as a by-product of the manufacture of other chemicals.[2] AMS requires the presence of an inhibitor, which in this case was tertiary-butyl catechol ("TBC"). The manufacturing specification for the level of TBC that should be present in AMS is 10–20 parts per million ("ppm").

AMS has a color specification of 10 APHA, based on the American Society for Testing and Materials Standard ("ASTM"). An APHA rating of 10 or less is required for AMS because it otherwise imparts color to the final product.[3] The APHA scale ranges from 0 or colorless, to 50, or yellow,

in five-unit steps. To determine the APHA color, a sample of the AMS is visually compared to liquid color standards, superimposed on a light background.

USS produced the subject AMS in Haverhill, Ohio. When manufactured, the APHA color of AMS is usually less than five. In this case, the AMS was shipped in barges from the Haverhill plant to the GATX Terminal in Galena Park, Texas. When the first load of AMS was shipped to Texas on April 14, 1978, it had a color of less than 5,[4] and the TBC was measured at 20 ppm. The shipment was stored in tank 12–6 at the GATX Terminal. On August 1, 1978, the contents of tank 12–6 were sampled and showed a color of less than 10 and an inhibitor level of 33 ppm. The tank's contents were again tested on August 8 to measure the inhibitor level, which was determined to be 33 ppm. On September 29, 1978, USS loaded another barge with AMS in Haverhill and sent the shipment to GATX, where it was added to the AMS previously stored in tank 12–6. At the time it was loaded in Haverhill, the second shipment of AMS had a color of less than 10 and an inhibitor level of 23.3 ppm. After discharge of the second shipment in late October of 1978, tests of the AMS in tank 12–6 showed a color of less than 10 and an inhibitor level of 22 ppm.

On November 12, 1978, preparations began for loading of the AMS aboard the M. T. Granheim. Superintendence Company, Inc. ("Superintendence"), which was retained by USS to inspect the AMS and supervise the loading procedures, inspected the vessel's tanks and issued a tank clean certificate indicating that the tanks were in good order and condition for receiving the cargo. After samples of the product in both the shoreline and the ship tanks were found satisfactory, loading was completed. Superintendence then conducted a compos-

---

1. Granheim's third-party action against GATX Terminals was dismissed at the end of the trial.

2. USS produces AMS as a by-product of its manufacture of phenol and acetone.

3. AMS is used in the production of musk oil fragrance, shoe soles and plastic pipe.

4. Hereinafter all references to color ratings are based on the APHA scale.

ite analysis of the three ship tanks containing the AMS[5] and found a color rating of less than 10 and an inhibitor concentration of 18.5 ppm. An ullage of several feet was left between the top of the cargo and the top of the tank.

A bill of lading dated November 12, 1978 was issued covering 1299.48 metric tons. The bill of lading incorporates by reference the terms and conditions of the October 28, 1978 charter party between USS and Antilles. The charter party specifically incorporates the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300, *et seq.* Moreover, the charter party entered into between Antilles and Granheim includes a clause paramount requiring the charterer to issue bills of lading that incorporate COGSA.

The M. T. Granheim arrived in Rotterdam on December 14, 1978. Prior to discharge, a composite sample of the three tanks was taken and tested by Chemisch Technisch Expertise-bureau ("CTE"), which was hired by USS to perform the discharge analysis. The composite sample had a color of 15 and, seemingly inexplicably, a TBC level of 20 ppm. After these tests, prepumpings were conducted to test the vessel's discharge system. Because prepumpings serve to clean the ship's pump and lines, the prepumped AMS was stored in small mobile tank units commonly used for this purpose. The first three prepumpings were markedly off specification, showing color levels of 50–60, 50 and 30–40, respectively. At this time, it was decided that a fourth prepumping would be conducted, this time into a larger container so that greater force could be used to clear the line. A one-foot sample was pumped into shore tank 1419, after which the AMS being discharged appeared to be clear. Thereafter, the discharge was continued in tank 1420. The sample in tank 1419 showed a color of 20–35, but the decision was made to resume discharging AMS into tank 1419, thereby blending the prepumped material with the main stock. Tank 1419 showed a final color of 20; tank 1420 had a final color of 15–20.[6] Tests run on the AMS after discharge failed to establish a conclusive reason for the discoloration. USS ultimately sold the AMS as off-specification material at a reduced price.

*Discussion*

The major task before the Court in deciding this dispute is to determine the cause of discoloration of the AMS. Given the conflicting evidence in this case, this is not an easy task. USS contends that the cargo was contaminated by foreign substances either in the M. T. Granheim's tanks or its pipelines. Granheim and Antilles argue that the discoloration, if any, was caused by an inherent vice of the cargo.

 Under COGSA,[7] a plaintiff has the burden of proving that the goods were damaged while in the custody of the carrier.

---

5. The AMS was loaded into 6 center starboard, 10 center starboard and 10 center port tanks.

6. The first foot sample in tank 1420 showed a color of 15–20.

7. Antilles argues that COGSA does not apply to this case and therefore USS must establish actual negligence by defendants. According to Antilles, the bill of lading in this case did not serve as a contract of carriage but merely as a receipt of the goods. The bill of lading states: "This shipment is carried under and pursuant to the terms of the Charter dated October 28, 1978 at New York between Antilles Shipping Co., Ltd. and United States Steel International as Charterer, and all the terms whatsoever of the said Charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment." Plaintiff's Exhibit 2.

The tanker voyage charter party between USS and Antilles provides:

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further." Plaintiff's Exhibit 1.

Antilles contends that paragraph 18 of the charter party is not inconsistent with COGSA

See *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347 (2d Cir. 1981). If the plaintiff satisfies this burden, it establishes a *prima facie* case for recovery and will recover for the damage unless the carrier proves one of the exceptions of Section 1304. *Id.* at 352. A shipper may establish its *prima facie* case by proving (1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition. *Id.*

In the present case, USS introduced evidence showing that the AMS had a color of less than 10 after loading and a color of 15 before unloading in Rotterdam.[8] Plaintiff contends that this evidence alone establishes its *prima facie* case. Defendants hotly dispute this point, arguing (1) that ASTM reporting methods were not followed in rating the color and (2) that the color ratings of 10 and 15 are within the 7-unit range of reproducibility for the test and therefore no actual change in color was proved.

Defendants are correct that the ASTM reporting standards were not followed in rating the color of the AMS. The ASTM method provides that if the color of the sample lies in between two standards, as for example 5 and 10, the darker of the two standards should be reported. Thus in the present case, a rating of more than 5 but less than 10 should have been reported as 10. Even viewing the evidence in this light, however, there was still a five-unit change in color from the time the AMS was loaded in Houston to the time it reached Rotterdam. Defendants seek to diminish this evidence by arguing that such a variation is inconclusive since it falls within the reproducibility range for the APHA color test. The ASTM standard test method states that "two results, each the mean of duplicates, obtained by operators in different laboratories should be considered suspect if they differ by more than seven platinum-cobalt units." Granheim Exhibit A–G. I do not read the standard as applying to samples taken one month apart on different sides of the ocean but rather to varying results obtained on samples of the same material, that is, samples taken at times so nearly concurrent that it is unlikely that substantial changes in the material have occurred. The ratings on tanks 1419 and 1420 in Rotterdam were 20 and 15–20, respectively. Clearly, these results are outside of the seven-unit reproducibility range, even if it did apply to these disparate samples.

The question whether USS has established a *prima facie* case, however, is complicated by Granheim's assertion that the discoloration of the cargo was caused by an inherent vice. "Whenever the defense of inherent vice is raised, and it appears that the damage arose internally, it self-evidently calls into question the good condition of the goods upon shipment." *American Tobacco Company v. The Katingo Hadjipatera*, 81 F.Supp. 438, 446 (S.D.N.Y.1948), *modified on other grounds*, 194 F.2d 449 (2d Cir. 1951).

■ Granheim maintains that the increase in color was caused by properties of AMS which cause it to discolor over time.[9] An inherent vice is any existing defect,

---

and therefore should govern. Paragraph 18 states:

"The vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination, or deterioration in color of the cargo unless the admixture, leakage, contamination, or deterioration results from (a) unseaworthiness existing at the time of the loading or at the inception of the voyage which was discoverable upon exercise of due diligence, or (b) error fault of the servants of the owner in the loading, care or discharge of the cargo . . . ."

The trouble with Antilles' argument is that if the paragraph is read as putting the burden of proof on USS, it is inconsistent with COGSA and therefore is subject to the paramount clause. Consequently, the argument is rejected.

8. USS also had a clean bill of lading.

9. One of USS's theories of contamination was that the tanks had not been sufficiently cleansed of their prior cargos. Granheim's expert conclusively established that six tons of ethyl acetate, which was previously stored in tank 6 center starboard, would have been necessary to discolor the AMS. It is beyond belief that 6 tons of ethyl acetate would have escaped the inspection by Superintendence before it is-

disease, decay or the inherent nature of the commodity which would cause it to deteriorate over a lapse of time. *Cf. Missouri Pacific Railroad v. Elmore & Stahl*, 377 U.S. 134, 139, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194 (1964). In this case, Granheim presented expert testimony that the oxidation of the inhibitor TBC will cause TBC to darken, thus imparting color to the AMS.

Dr. Frederick Eirich ("Dr. Eirich"), Granheim's expert witness,[10] testified that TBC is added to AMS in order to prevent its oxidation. According to Dr. Eirich, AMS oxidizes easily and TBC is added to consume the oxygen before it can attack the AMS. As TBC becomes oxidized, however, it forms increasingly dark compounds that impart color to AMS. The amount by which the color of AMS increases depends upon the extent to which the TBC has oxidized and its own color deepened. Not surprisingly, agitation of the cargo causes TBC to oxidize more quickly, thus limiting its effective life and darkening its color.

Dr. Eirich testified that TBC at a level of 20 ppm, if oxidized substantially, can change the color of AMS. He estimated that 100 pounds of TBC had been added to the AMS in this case and testified that if half of that amount oxidized to the color of dark ink, it could raise the color of the AMS 8 to 10 points. Because of the danger that oxidized TBC will impart color to AMS, Dr. Eirich stated that lower levels of the inhibitor than those which are used in other styrenes should be maintained. He testified that 10 ppm is the safest level at which the TBC can prevent oxidation of the AMS without significant danger of discoloration. Dr. Eirich acknowledged that the agitation and resulting oxidation of the TBC during an ocean voyage would decrease the effectiveness of the inhibitor, but maintained that by increasing the TBC level the risk of discoloration is also increased.

Since the agitation of the cargo usually results in a drop of the inhibitor level, USS added extra TBC to the shipments of AMS before sending the barges from Haverhill to Houston, thereby increasing the TBC concentrations to 20–23 ppm. More TBC was added in Houston. Tank 12–6 at the GATX Terminal showed an inhibitor level in August of 33 ppm. When the AMS was loaded on the M. T. Granheim in November, the TBC level was 18.5 ppm.[11]

Dr. Eirich believed that some color increase in the AMS had occurred before the vessel left Houston but that the increase was not reflected in the measurements because of the practice of reporting color only in 5-unit steps. He explained the increased discoloration reflected in the tests conducted in Rotterdam as the result of agitation of the cargo during the voyage.[12] Moreover, Dr. Eirich stated that the passage of time allowed for increased interaction between the TBC and AMS.[13]

---

sued the tank clean certificate. The two number 10 tanks contained hexane prior to receiving the AMS; the unrebutted expert testimony was that hexane would not affect AMS or TBC. Granheim also offered the testimony of Harold Solberg ("Solberg"), the first mate on the M. T. Granheim during the relevant voyage. Solberg explained the thorough cleaning procedures given the tanks and testified that nothing unusual happened during the voyage. Granheim also introduced the certificate issued by USS's surveyor which stated that the tanks were clean and suitable for the cargo.

10. Dr. Eirich has a Ph.D. from the University of Vienna, an M.A. from the University of Cambridge, another degree that is the equivalent of a Doctor of Science from Cambridge and is qualified to teach at the Universities of Vienna and Cambridge. He has been associated as a professor with the University of Brooklyn (formerly the Polytechnic Institute) since 1952 and from 1967 to 1970 served as dean of Research. His main training is in physical chemistry as applied to polymers and plastic materials.

11. Between the August and November readings, another bargeful of AMS from Haverhill was added to tank 12–6.

12. Thus, Dr. Eirich explained the apparently unchanged color of the AMS remaining in tank 12–6 as the result of a lack of agitation.

13. Dr. Eirich testified that if TBC is oxidized in the presence of impurities such as metal ions, the color of the oxidized TBC will be enhanced. He further testified that such a reaction will not

One troublesome point with Dr. Eirich's theory is that the inhibitor level did not show a decrease during the ocean voyage, suggesting that the TBC did not oxidize to a great degree. When the M. T. Granheim left Houston, the TBC was measured at 18.5 ppm; when the vessel reached Rotterdam, the TBC level was 20 ppm. All parties conceded that the amount of TBC cannot increase during the voyage. Consequently, the variation of the test results casts doubt on the reliability of at least one, if not both, of the tests. Dr. Eirich testified that, even assuming that only two or three percent of the TBC had oxidized during the voyage, the previous high levels of TBC would have been capable of causing the measured color increase.

Testimony by persons with experience in dealing with AMS confirmed Dr. Eirich's opinion that AMS is unstable as to color. Mr. Fish of GATX Terminals testified that it is normal to have a decrease in the inhibitor level and that a drastic drop will affect the color of the AMS. CTE's surveyor Van Muyen testified that aeration and agitation of AMS can affect its color, a statement also made by Cheng Hang ("Hang"), a laboratory manager for Superintendence. Similar testimony was given by Johannes van de Giesen ("van de Giesen"), a surveyor for van Ameyde Company, which was hired by the charterer. In his commission testimony, van de Giesen stated that the company knew from experience that products like AMS may have unstable properties which can result in a darkening of color over time.

With respect to the increased discoloration of the AMS measured after the cargo was discharged, Granheim contends that the higher color was caused by blending some of the prepumped material into the main stock. The ship's tanks before discharge had a composite rating of 15. As noted above, the prepumpings showed marked discoloration, ranging from 50–60

to 35, whereas the final samples from the shore tanks had color ratings of 20 and 15–20. There is no serious dispute that prepumpings are normal in the industry and that they serve the purpose of cleaning the ship's lines and pumps. Thus, Granheim makes no effort to explain the discoloration of the prepumped material other than to emphasize the necessity of prepumping. With respect to the bulk of the cargo, however, Granheim maintains that the blending of the fourth batch of prepumped material, in addition to the color sensitivity of the product established above, caused the color increase.

According to the documents introduced at trial, three prepumpings were run into small mobile units on the shore. Thereafter, a fourth prepumping was run into shore tank 1419, which was larger and could accommodate a faster prepumping. A faster, more forceful prepumping was desirable in order fully to flush out the lines. A sample of the fourth prepumping showed a color of 20–35. van Ameyde Company, the charterer's surveyor, issued a report stating:

> "... on the 16th December 1978 at approx. 02.20 hours the a. m. s. was clear and in apparent good condition at the vessel's manifold after some 35 cbm of product had been discharged into shore-tank No. 1419. The discharge was then continued into shoretank No. 1420 and a sample was drawn from the No. 1419. This sample was analyzed and the result was that the 35 cbm of product in that tank could be blended with the main stock, so that from then on the discharge was continued as planned."

Antilles Exhibit A–F p. 2. van de Giesen, van Ameyde's surveyor, stated in his commission testimony that he believed USS instructed its inspectors to blend the main stock with the prepumped material in tank 1419. CTE, USS's surveyor, stated in its report that

become obvious immediately but will take a matter of days or weeks. Both the Haverhill and GATX tanks are uncoated carbon steel, which will rust over time. No proof that the tanks actually were rusty was produced, however.

"[u]nloading was resumed with placing a testportion into shoretank 1419. Samples drawn from said testportion and at the end of the shoreline were tested and found to be in such a condition that the unloading could be resumed without further delay."

USS Exhibit 5, p. 2. USS offered no evidence with respect to the blending.

After the discharge, CTE ran additional analyses in an attempt to determine the cause of the discoloration. The tests failed to reveal any foreign substances in the AMS but CTE made the assumption that the discoloration must have been caused by the catalytic effect of rust particles too fine to be detected by the testing. This conclusion, however, is at odds with the testimony of Dr. Carl C. Gryte ("Dr. Gryte"), GATX's expert witness. Dr. Gryte testified that the two to three pounds of iron oxide necessary to cause the discoloration would have been apparent in the line-start sample as well as the one-foot sample in the tank.[14] According to Dr. Gryte, that amount of iron oxide would have muddied the cargo. Thus, CTE's assumption as to the cause of the discoloration cannot be accepted.

■ Having presented the above evidence, Granheim contends that the burden of proof rests with USS to disprove the existence of an inherent vice. This argument, of course, assumes that USS established a *prima facie* case. Although USS offered into evidence documents showing that the AMS was on specification in Houston, there is a substantial question as to whether the carrier must prove inherent vice or whether the shipper must disprove inherent vice as a part of its showing that the cargo was in good condition upon delivery. See *Caemint Foods, Inc. v. Brasileiro, supra,* 647 F.2d at 356 (questioning whether

carrier has burden of proving inherent vice exception) and cases cited therein; *Vana Trading Company, Inc. v. S. S. "Mette Skou,"* 556 F.2d 100, 105 n.9 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Elia Salzman Tobacco Company v. S. S. Mormacwind,* 371 F.2d 537, 539 n.2 (2d Cir. 1967) (declining to decide whether carrier or shipper carries burden of proof on inherent vice). The older case law in this Circuit, however, has placed the burden of disproving inherent vice upon the shipper. See *American Tobacco Company v. Goulandris,* 281 F.2d 179, 182 (2d Cir. 1960); *Hecht Lewis & Kahn, Inc. v. The S. S. President Buchanan,* 236 F.2d 627, 631 (2d Cir. 1956); *American Tobacco Company v. The Hadjipatera,* 81 F.Supp. 438, 446 (S.D.N.Y.1948), *modified on other grounds,* 194 F.2d 449 (2d Cir. 1951).

■ In view of the clear holdings of these older Second Circuit cases which have never been overruled, this Court is bound to apply the burden of proof as stated therein. However, in this case, the question is purely academic because the Court finds that Granheim has established by a preponderance of the evidence that the discoloration was caused by an inherent vice.

USS attempts to rebut the showing of an inherent vice in the AMS by the testimony of Hang [15] and Jean Tate ("Tate"), a phenol chemist with USS in charge of quality control. Both Tate and Hang testified that AMS will not change color in the absence of a foreign contaminant. According to Tate, TBC actually prevents color formation by reacting with the oxygenated compounds that are part of a color formation process. Mrs. Hang testified that TBC does not oxidize at all. Tate also testified that the TBC, when added to the AMS, is already a dark color and that he did not understand

---

14. Dr. Gryte was testifying on the question of whether rust in GATX's mild steel tanks and loading lines could have caused the discoloration. Nevertheless, the Court finds his testimony relevant to the identical question concerning Granheim's lines and pump.

15. Tate has a bachelor's degree in Chemistry from the University of Michigan. Mrs. Hang has a bachelor of science degree from the University of Singapore with honors in Chemistry.

Dr. Eirich's testimony that further oxidation of the TBC would deepen the AMS color. Furthermore, Tate stated that to his knowledge USS had never had a previous claim for discoloration of AMS.[16]

After weighing the conflicting evidence, the Court finds that the discoloration of the AMS was caused by an inherent vice of the product.[17] The testimony of witnesses who deal with AMS confirmed Dr. Eirich's testimony that the chemical is color sensitive. Even Hang testified that an increase of 5 in the color rating is not unusual after agitation of the cargo. Nor did USS offer any explanation for the increase in color from less than 5 when manufactured to less than 10 when the cargo was loaded in Houston, the implication being that such an increase is not unusual. Moreover, Dr. Eirich's extensive background in this area leads the Court to give great weight to his testimony. Although Tate testified that USS has not had other claims for discoloration of AMS, that statement was not supported by any specific or documentary evidence of prior shipments. Thus, there was no evidence of the TBC levels in prior shipments, nor was there any evidence demonstrating the color of prior shipments of AMS when loaded and discharged. Also missing was any evidence as to the amount of ullage in earlier shipments. In the absence of such evidence, the persuasiveness of Tate's testimony is greatly lessened, especially in light of the testimony of other witnesses that AMS is prone to changes of color. Finally, USS offered no evidence to refute Granheim's position that the blending of the fourth prepumped material into tank 1419 caused the higher color, nor that handling of the cargo could result in deepening of the color.

Having failed to disprove or to rebut the preponderant evidence offered by defendant that AMS has an inherent vice that can cause it to discolor, USS alternatively could have sustained its burden by showing that defendants' negligence caused the damage. See *Caemint Foods v. Braseleiro, supra,* 647 F.2d at 355. In this case, however, USS did not come forward with actual proof of negligence in the handling of the main stock. With respect to the prepumped material, however, it is clear that something in the vessel's lines or pump caused the extensive discoloration. Granheim made no attempt to explain the discoloration of the prepumped material except to argue that prepumpings are used in the industry in order to flush out the lines. Apparently, Granheim concedes that the lines and pumps were responsible for producing off-specification material from the prepumpings. At the trial, the parties referred to the quantity of the prepumped cargo as 10 metric tons, although no definitive proof of this quantity was established. Moreover, it is not clear that USS intended to pursue recovery for damage to this relatively small amount of AMS. Accordingly, the parties are directed to appear for a conference on July 2, 1982 at 11:30 A.M. in Room 608, unless they are able to resolve this issue beforehand. As against Antilles, the com-

16. USS asserts that the vessel Stolt Tenacity was loaded with AMS from tank 12–6 at the GATX Terminal on December 13, 1978 and the cargo arrived at its destination on specification. Plaintiff's Exhibit 20, however, reveals only that the AMS had a color of 5 after being loaded on the Stolt Tenacity. There was no evidence presented on the color of the AMS at outturn and thus USS's argument is not supported by the record.

17. A similar result was reached by Judge Pollack in *Dow Chemical Co. (U.K.) v. S. S. Giovannella D'Amico,* 297 F.Supp. 699 (S.D.N.Y. 1969). In that case, a shipment of styrene monomer had discolored during transit. TBC had been added to the styrene as an inhibitor and the level of TBC decreased during the voyage. The court found that the oxidation of the styrene and the TBC resulted in the formation of a brownish compound which discolored the cargo. As in this case, there was no evidence of rust or a foreign contaminant in the cargo. Judge Pollack found that the discoloration of the styrene was caused by oxidation of the styrene and TBC during loading and by the further oxidation of the TBC during the voyage due to the ullage in the cargo tank.

plaint is dismissed; Granheim is liable for the prepumped material only.[18]

SO ORDERED.

---

18. Granheim argued that it was not liable *in personam* for damages under the bill of lading on the ground that it did not sign the bill. With respect to the prepumpings, however, the evidence of negligence is obvious and thus Granheim's argument is not relevant to these damages.