The **TOKIO MARINE & FIRE INSURANCE CO., LTD.,** Plaintiff,

v.

**M/V L. JALABERT BONTANG, and P.T. Trikora Lloyd, Defendants.**

**No. 84 Civ. 1053(MP).**

United States District Court, S.D. New York.

Dec. 20, 1985.

Alexander Lesyk, Vincent, Berg, Russo, Marcigliano & Zawacki, New York City, for plaintiff.

Thomas Healey, Healey & McCaffrey, New York City, for defendants.

## DECISION AND OPINION

MILTON POLLACK, Senior District Judge:

This admiralty case arises from water damage to a shipment of fifty-four pallets (or crates) of SIR–20 (Standard Indonesian Rubber, grade no. 20) rubber from Padang, Indonesia to New Orleans, Louisiana, F.O.B. Padang. The issues were presented to the Court at a Bench trial.

## BACKGROUND

### Who The Parties Are

P.T. Kilang Lima Gunung (of Indonesia) ("seller") sold fifty-four pallets of rubber to Marubeni America Corporation ("Maru-beni") ("buyer"), 200 Park Avenue, New York, N.Y.; the invoice was consigned to "Order of Bank Dagang Negara Padang" for the account of Marubeni. The rubber was shipped from Padang to New Orleans on the M/V L. Jalabert Botang, a vessel owned by defendant P.T. Trikora Lloyd ("carrier"), an Indonesian corporation with a place of business at Two World Trade Center, New York, N.Y. (c/o Kerr Steamship Company). After the arrival of the rubber in New Orleans, the buyer sent a letter to the carrier indicating that the rubber ordered was damaged and that it was holding the carrier liable for the damage. Plaintiff, The Tokio Marine & Fire Insurance Co., Ltd. ("Tokio Marine"), paid buyer $21,632.42 under an insurance policy for damage to the shipment. Plaintiff insurance company sues as a subrogee on the buyer's claim against defendant carrier.

### How Rubber Is Initially Processed Into Blocks

Defendant's witness James Burley, a rubber processing specialist, and plaintiff's rebuttal witness Henry Schmeltzer, a chemist/laboratory specialist, testified as experts at length regarding the processing of rubber from the tree through to the finished product (e.g., a rubber tire). In short, the initial rubber processing is as follows:

The natural latex solution ("dry rubber"—i.e., latex—content of approximately 30–40%) that oozes from the rubber tree is collected in cups and then emptied into larger five gallon milk cans. These cans are then emptied into a stainless steel truck to be taken to the processing area. At the processing plant, this substance is placed in stainless steel process tanks and a coagulant is added. Excess fluid is drained off. The remaining substance is approximately 65% dry rubber content. Excess water is squeezed out; the substance then is put through a hammer mill, is chopped and placed in pans that are approximately the size of a finished block (or bale) of rubber.

The substance is then heated at approximately 200–225 degrees Fahrenheit (the boiling point of water is 212 degrees Fahr-

enheit) for four to six hours in a drying oven. Before entering the drying oven the substance is completely white like cheese and upon exiting the oven it is a shade of brown. Many of these blocks (approximately 75 pounds, or approximately 22 of them) are then compressed in a baler press under hydraulic pressure (approximately 20–25 tons of pressure per square inch) to make one block (*i.e.*, the final product after initial processing). Samples of the rubber are then taken to determine its moisture content.

These seventy-five pound finished blocks are stood upright and allowed to cool for eight to twelve hours. A polyethylene bag is then slipped over them; this bag is sealed at one end and partially open at the other; three spot thermal welds are placed on the open end. Any moisture present in the environment is sealed within the bag; Indonesia has a very humid climate.

### How Rubber Is Packed, Shipped and Processed Again

Thirty of these seventy-five pound, individually wrapped, blocks are stacked in five tiers, six blocks to each tier. The rubber itself thus weighs approximately 2250 pounds.

Between each tier of six blocks is placed a sheet of polyethylene (an "interleaf"). The long ends of these interleaf sheets are folded together loosely, not fastened, and another interleaf, colored blue, is laid over the top as a cap. These thirty blocks are then forced into a wooden pallet (or crate), held together by metal bands, and the top to the pallet is nailed down. Thus, there are three layers of polyethylene sheets, inside the pallet, covering the rubber.

This pallet is then shipped abroad from Indonesia. Upon arrival, it is inspected, either accepted or rejected, and if accepted sold to a company that will, through further processing, turn the natural rubber into a finished product.

The first stage of manufacturing the rubber into a finished product is to drop blocks from various lots of rubber into a Banbury mixer (*i.e.*, blending). The Banbury runs for a specified time at approximately 350–400 degrees Fahrenheit. Any excess moisture, *i.e.*, light spots, is driven off as steam. This rubber mixture is dropped on a mill, sheeted out, and allowed to cool. Samples are sent to the laboratory and if the tests are satisfactory, a release slip is sent back to the factory. Further processing into the finished product then begins.

### Chronology of Events

The shipment of the fifty-four pallets of SIR–20 rubber was sampled for quality tests in Indonesia between December 15 and 27, 1982. The rubber at that time had just slightly more than one-third of one percent water content (noted as "volatile matter" on the inspection report). Defendant carrier issued bill of lading number eleven on February 28, 1983, for this fifty-four pallet shipment, each said to contain thirty blocks, or a total of 1,620 blocks. According to the shipping invoice, the price for these fifty-four pallets of rubber, F.O.B. Padang, was $46,457.50. Adding prepaid freight, the total cost came to $51,-911.50.

The fifty-four pallets covered by bill of lading number eleven were carried in hold number three of a four-hold ship. Hold number three was loaded in Padang on March 1 and 2, 1983. On March 1, rubber was loaded in hold number three from 17:30 (5:30 p.m.) to 18:20 (6:20 p.m.) and again from 19:30 (7:30 p.m.) until 20:05 (8:05 p.m.). At 20:05 the hatches for all four holds were closed "due to rain and gangs off [sic]." [1] There was "[n]o cargo activity during the night due *to heavy rain.*"

On March 2, rubber was loaded into hold number three from 08:30 (8:30 a.m.) to 11:30 (11:30 a.m.) and again from 13:30 (1:30 p.m.) to 21:30 (9:30 p.m.). At 21:30, the Captain "[c]losed all the hatch [sic] and no cargo activity during the night due *to heavy rain.*"

---

**1.** Contrary to what plaintiff tried to demonstrate at trial, there is no indication from the ship's logs for March 1 and 2 that any hatch was closed any sooner or later than another hatch.

The ship left Padang on March 5, 1983, and arrived in Norfolk, Virginia on April 1, 1983. At that time, additional cargo was loaded; intermittent rain was experienced during loading. The ship arrived in New Orleans sometime in April 13–15, 1983.

An employee of R.H. Keen & Co., Mr. Gene Colley, at some time prior to April 25, 1983, inspected the rubber on behalf of the buyer Marubeni.[2]

On April 17 and 18, 1983, at the request of Kerr Steamship Company ("Kerr") (a company related to defendant carrier), S & T Marine Surveyors Inc. surveyed the ship and its entire cargo while the cargo was still in stow. Although various kinds of "contamination" (*e.g.*, coffee beans, polyethylene pellets) and damage (*e.g.*, broken pallets) were noted in the report, *no water damage was noted*. In fact, in the only reference to water in the entire report, it states that "[n]o water stained bags [of coffee in hold number one] or otherwise stained bags were observed." S & T Marine Surveyors apparently made follow-up visits to the wharf from April 19–22, 1983, in order to supervise the reconditioning of the damaged and/or contaminated pallets noted previously in their report. The report does not state whether during these follow-up visits the cargo discharged from the ship in apparently good condition was again surveyed for any subsequent damage.

In a letter, dated April 21, 1983, from buyer Marubeni to Kerr, buyer stated, in part, "[p]lease be advised the captioned shipment has arrived in a damaged/short condition and we are holding you responsible and liable for this loss."

At buyer Marubeni's request, on April 27, 1983, Lakes & Eastern conducted a survey of the fifty-four rubber pallets. Previously, in a letter, dated April 22, 1983, from Mr. Thomaston of Lakes & Eastern Marine Surveyors ("Lakes & Eastern") to Kerr, Mr. Thomaston confirmed a telephone conversation in which a Mr. Gonzales of Kerr declined to participate in a joint survey of the rubber.

Lakes & Eastern assigned Jeffrey Snyder to conduct this survey. When Mr. Snyder, accompanied by others, surveyed these pallets, they were stored indoors in a wharf warehouse building. The surveyor, therefore, never viewed the pallets aboard ship nor made any investigation of the conditions under which the rubber was shipped. There is no evidence of when the pallets were moved to the wharf or of where they were before being moved there (*i.e.*, whether moved there directly from the ship or whether they sat exposed, outdoors for a period of time).

Mr. Snyder conducted a silver nitrate field test to determine whether chlorides (indicating contact with ocean water) were present on the pallets. The tests were negative, indicating no salt water contact.

Mr. Snyder noted that these pallets were wrapped in the standard way, discussed previously. Each block was individually wrapped in a polyethylene bag and then a second polyethylene liner was wrapped around all the blocks, inside the pallet. Finally, the inside of the pallet (or crate) was reinforced with a blue polyethylene sheet.

Mr. Snyder's visual inspection of the fifty-four pallets revealed that some of them had external evidence of water contact, *e.g.*, stained crates, rusted securing bands and nails. Mr. Snyder concluded that twenty-six pallets had been affected by water and that twenty-eight had not. He then segregated the affected from the unaffected pallets.

Mr. Snyder selected two of the twenty-six water-affected pallets to be disassembled so that the blocks could be inspected in detail. These two pallets were selected because, from external observations, they appeared to be extreme examples (*i.e.*, one showing minimal external evidence of wa-

---

**2.** It is unclear exactly when his inspection took place, whether he prepared a report regarding the condition of the rubber at that time, and what skills he possesses in evaluating rubber.

In any event, neither Mr. Colley's initial inspection's findings nor, indeed, even the existence of a prior inspection was mentioned at trial.

ter contact and the other showing substantial exposure to water) of the twenty-six affected pallets. The other water-affected pallets were lifted by a forklift and externally examined, visually. In addition, windows were cut in the blue polyethylene liners of all twenty-six affected pallets to facilitate viewing. After thus inspecting the twenty-six pallets, Mr. Snyder concluded that 53 percent of the twenty-six pallets were damaged by the presence of excess water.

On the basis of the Snyder survey report, the buyer Marubeni rejected the allegedly water-affected pallets on April 28, 1983. Lakes & Eastern was instructed by the buyer to salvage the water-affected rubber for the best price. Because time was of the essence,[3] nine potential bidders were contacted by telephone. Three submitted bids, and the highest bid of 10 cents per pound was accepted, for a total salvage amount of $5,846.60.

On May 23, 1983, buyer Marubeni sold fifty-four pallets (123,150 pounds) of SIR–20 rubber to Bridgestone Tire Maunfacturing Inc. for $57,535.80. Twenty-eight of the pallets were designated as being part of the shipment subject to this litigation and twenty-six were designated as being from another shipment.

*How Water Affects The Rubber's Usefulness*

Rubber and fresh water are always present together in the environment. As the preceding discussion of rubber processing indicates, at no point in processing is water completely eliminated from the rubber. The percentage content of water in the rubber can, and does, vary.

Although the presence of some amount of water in rubber is essential to its proper condition and functioning, an excess amount causes "bleaching"[4] and may, de-

pending upon the extent of the bleaching, impede processing. Minimal bleaching, *i.e.,* light spots on the block's edges or within the blocks (approximately the size of a quarter or half-dollar) has no quality effect on the Banbury processing. Above a certain amount, however, bleaching has both economic and technological aspects.

Economically, the more water included in the rubber, the less dry rubber content per block and thus the more the cost for the natural rubber itself. Standardization of water content thereby prevents producers from "palming off" rubber with a lower dry rubber content. In addition, minimizing the water content prior to shipping reduces shipping costs.

Technologically, rubber with water content significantly in excess of specification has an effect on the Banbury process. If mixed in the Banbury without first being "dried out" so that the rubber is within specification, the Banbury process will have to continue for a longer period of time, with the accompanying risk of a quality defect occurring, *i.e.,* producing "soft rubber." Tire manufacturers will not use soft rubber. At the very least, this extra drying out process costs extra money.

## DISCUSSION

By virtue of our admiralty jurisdiction, this Court has subject-matter jurisdiction over this subrogated claim by an insurance company against an ocean carrier for alleged breach of a contract of carriage. 28 U.S.C. § 1333(1) (1982). Consequently, this case is governed by federal maritime law. *Allied Chemical International Corp. v. Companhia De Navegacao Lloyd Brasileiro,* 775 F.2d 476, 481 (2d Cir.1985).

 Because the rubber was shipped in foreign commerce under a bill of lading [5]

---

**3.** Apparently at this time there were large quantities of water-affected rubber in New Orleans. There is no indication of weather conditions (*i.e.,* rainfall) in New Orleans at the time in question, however.

**4.** Water in excess of SIR–20 specifications, *i.e.,* over one percent content, turns the color of the

rubber to white. Thus the water content of the rubber can, in a rough way, be determined from its color.

**5.** A bill of lading for ocean carriage acts as a receipt for goods shipped, embodies the contract of carriage for those goods, and serves as documentary evidence of title to the goods. *See*

to a United States port, Tokio Marine's right to recover on its claim is controlled by the provisions of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300–15 (Supp. I 1983). *Id.* at §§ 1300, 1312; G. Gilmore & C. Black, *The Law of Admiralty* 145 (2d ed. 1975) ("a bill of lading covered by Cogsa is to be read as though Cogsa were incorporated by reference."). Although by its own terms COGSA's applicability is limited to the period of time from loading through discharge of the cargo, 46 U.S.C.App. at § 1311; G. Gilmore & C. Black, *supra*, at 147, the parties to the contract may, and did in this case, agree to incorporate the terms of COGSA for the period of time prior to loading and after discharge as a *contractual* term in the bill of lading. *Allied Chemical*, 775 F.2d at 483.

■ Under the provisions of COGSA, a "plaintiff has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.'" *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351 (2d Cir.1981) (quoting *Pan-American Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871, 871 (S.D.N.Y.1921) (L. hand, J.)). Further, carriers are not strictly liable for the condition of the cargo but are liable for loss or damage to cargo only on the basis of fault. *Allied Chemical*, 775 F.2d at 483; G. Gilmore & C. Black, *supra*, at 150. Thus, plaintiff has the burden of proof to establish that defendant was negligent and that defendant's negligence caused plaintiff's damages.

■ A plaintiff establishes a *prima facie* case for recovery from a carrier under COGSA by proving "(1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in a damaged condition." *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982). Once plaintiff has established its *prima facie* case, the burden shifts to the carrier to prove either that it exercised due diligence to prevent the damage by properly handling the cargo on a seaworthy ship, 46

U.S.C.App. §§ 1303(1) & (2), or that the damage falls within one of COGSA's exceptions set forth in 46 U.S.C.App. § 1304(2). *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1227 (11th Cir.1983) (per curiam); *Westway Coffee*, 675 F.2d at 32. Because plaintiff Tokio Marine has failed to establish by a fair preponderence of the proof either of the two requirements, plaintiff's claim will be denied.

■ The first requirement of a *prima facie* case, delivery of the cargo to the carrier in good condition, may be proved in either of two ways. First, a plaintiff may produce a clean bill of lading, which is ordinarily *prima facie* evidence of delivery of the cargo in good condition. *Caemint Food*, 647 F.2d at 352; *see* 46 U.S.C.App. § 1303(3)(c) & (4). Second, a plaintiff may demonstrate that "the nature of the damage suffered indicates that the damage occurred after delivery of the cargo to the carrier." *Goya Foods, Inc. v. S.S. Italica*, 561 F.Supp. 1077, 1082 (S.D.N.Y.) (Lumbard, J.), *aff'd without opinion*, 742 F.2d 1434 (2d Cir.1983); *see Caemint Food*, 647 F.2d at 355.

■ In this case, Tokio Marine attempted to rely on a clean bill of lading to prove delivery of the rubber to the carrier in good condition. Apparently recognizing that relying on a clean bill of lading is insufficient to prove delivery in good condition when the goods are "shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded," *Caemint Food*, 647 F.2d at 352; *Westway Coffee*, 675 F.2d at 32–33, Tokio Marine contends that the three polyethylene layers covering the rubber shipment, the outermost layer of which was colored blue, were translucent. Thus, Tokio Marine contends that any water damage to the rubber would have been visible upon loading and, therefore, was not present at the time of loading since not noted on the bill of lading. In light of the layered packaging, the contention that the water underneath the polyeth-

*Internatio, Inc. v. M/V Yinka Folawiyo,* 480 F.Supp. 1245, 1251 (E.D.Pa.1979).

ylene layers would be visible to the naked eye from the outside of the packages is unacceptable and not credible.

Tokio Marine contended, through the introduction into evidence of the deposition of surveyor Jeffrey Snyder, that the blue polyethylene wrapping was translucent. As noted previously, Mr. Snyder was the surveyor hired by the plaintiff's insured, Marubeni America Corp., to survey the rubber on April 27, 1983, approximately two weeks after arrival in New Orleans and ten days after the initial survey in which no water damage was noted. In the report of the April 27 survey, however, it states that "[w]e noted some crates with windows cut in the plastic liners with some bleached bales visible." Exhibit 2, at 2, to Plaintiff's Exhibit 14. In other words, in the later survey report, the only indication that bleached blocks were visible was by viewing them *through* windows that had already been cut in the blue polyethylene liner. Along this same line, it is highly significant that the surveyor cut windows in the blue polyethylene liner of *each* of the twenty-six pallets suspected of water damage so as to view the packaged rubber blocks within the pallet. If the blue polyethylene liner was in fact translucent there would appear to be no need for such a procedure.

Moreover, defense witness Captain Max Korah, a man thoroughly familiar with the standard packaging and shipping of SIR–20 rubber, stated that the blue polyethylene wrapping was not translucent. His testimony was careful and credible. Tokio Marine's attempt to discount his testimony by stating that Captain Korah did not see the actual shipment subject to this lawsuit, and that only Mr. Snyder did, is disingenuous given its attempt to counter the carrier's argument that the goods were improperly packaged by claiming that the rubber was packaged according to "the best method currently available for such purpose." Plaintiff's Post-Trial Memorandum, at 24. The shipment was, therefore, packaged in the standard way; the blue polyethylene liner was not translucent. The carrier could not determine, by reasonable inspec-

tion, the condition of the wrapped rubber concealed within the blue polyethylene sheet. Tokio Marine's reliance on a clean bill of lading to prove delivery to the carrier devoid of water, bleaching, and damage underneath the liners, *i.e.*, in good condition, thus, must fail.

As noted previously, however, a plaintiff may still prove delivery to the carrier in good condition by demonstrating that "the nature of the damage suffered indicates that the damage occurred after delivery ..." *Goya Foods*, 561 F.Supp. at 1082. Although plaintiff did not argue this second method of proving delivery in good condition, the April 27 survey report notes that "[w]e were not in attendance during discharge of subject shipment from ocean vessel; however, water stained crates, rusted bands and nails *apparently existed prior to discharge.*" Exhibit 2, at 6, to Plaintiff's Exhibit 14 (emphasis added). This indication of *external* signs of wetting (which, if present at loading, should have been noted on the bill of lading), by itself, however, is insufficient to carry plaintiff's burden of proof for two reasons. First, there was no sufficient linkage of this external contact with fresh water to an effect on the rubber within, wrapped with three layers of polyethylene. There was no evidence adduced at trial regarding whether superficial or substantial fresh water contact is required to cause these signs of external wetting to occur. Second, there is no indication of when this external contact occurred; it apparently could have occurred very shortly before the April 27 survey. Significantly, the surveyor, Mr. Snyder, at his deposition could not even state how recently the rubber itself had been damaged by water and on cross-examination conceded that the damage could have occurred very shortly before his survey, *i.e.*, after discharge of the cargo in New Orleans. Plaintiff's Exhibit 14, at 63. Plaintiff thus also has failed to produce sufficient evidence to satisfy this second method of proving delivery of the cargo to the carrier in good condition.

Plaintiff, therefore, has failed to prove that there was any difference in water content when it was packaged, loaded, and delivered. Although Tokio Marine's *prima facie* case fails, without more, because of its inability to prove delivery of the cargo to the carrier in good condition, neither was plaintiff able to satisfy the second requirement for a *prima facie* case, *i.e.*, outturn by the carrier in a damaged condition.

Defendant's surveyor surveyed the cargo of the entire ship on April 17 and 18, 1983. As stated previously, no water damage was noted in their survey report although other kinds of damage and "contamination" were. On April 27, 1983, plaintiff's surveyor did note extensive water damage. No evidence was adduced at trial indicating when delivery of the cargo was made, when it was moved to the warehouse, or what weather conditions existed in New Orleans in the period from April 17 through 27.[6] Indeed, there was no testimony regarding how long it takes for water to affect rubber wrapped in the standard manner in the way this rubber was affected.[7]

Given the absence of proof presented by plaintiff on these issues, it is not more likely than not that the damage to the rubber pallets occurred prior to discharge.

Plaintiff's case contains gaps in the proof of proximate cause that can be filled only by speculation and assumptions in place of permissible evidentiary inferences from proofs submitted. Plaintiff could not point to any negligent act of the carrier that proximately caused plaintiff's damages while the rubber was in the carrier's possession.

Since plaintiff has failed to sustain its burden of proof for recovery from the carrier under COGSA, this Court need not address defendant's further claims that the damage occurred either because of an inherent vice[8] or because of inadequate packaging. *See* 46 U.S.C.App. § 1304(2)(m) & (n). Plaintiff's claims are dismissed, with costs.

The foregoing shall constitute this Court's findings of fact and conclusions of law under Rule 52(b), Federal Rules of Civil Procedure.

So Ordered.

6. Plaintiff did not argue, in the alternative, that if the rubber pallets were damaged after discharge in New Orleans, but before delivery, defendant would be liable for any negligence under COGSA's provisions, as contractually agreed, *see Goya Foods*, 561 F.Supp. at 1085 (applying the Harter Act's provisions in the absence of contrary agreement), or, if defendant was still in possession after delivery, as a bailee. *See id.* at 1086. Plaintiff's failure to prove the items enumerated in the text accompanying this footnote forecloses such arguments anyway.

7. The only testimony regarding time was that water "droplets" (condensed from natural humidity within the polyethylene bags) could bleach the block rubber if exposed to it for an extended period of four to six weeks.
 According to plaintiff's expert, Mr. Schmeltzer, the results of a *1985 test* on the standard rubber packaging involved in this case indicate that "even the slightest rain can cause damage to rubber packed in this fashion." There was no proof, however, in how short or long a period the rubber is affected by the packaging being permeated by water. Moreover, at the time of this shipment, according to Mr. Schmeltzer, the standard packaging of rubber in these three polyethylene sheets was believed by the rubber industry to be impervious to water; carriers, therefore, could reasonably believe that these rubber shipments wrapped in the standard manner did not have to be protected from ordinary rain.

8. There appears to be some controversy concerning whether the shipper or the carrier has the burden of proof on the inherent vice issue. *See United States Steel International, Inc. v. M.T. Granheim*, 540 F.Supp. 1326, 1332 (S.D.N.Y. 1982) (citing cases).