870 F.2d 655
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
H.F. STAIGER COMPANY, Plaintiff-Appellee,
v.
P.T. Trikora LLOYD, Defendant-Appellant.
 No. 88-2556.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 8, 1988.
Decided March 8, 1989.
 
 R. John Barrett (Vandeventer, Black, Meredith & Martin, on brief) for appellant.
 Richard Ivan Gulick (Gulick and Sutton, on brief) for appellee.
 Before MURNAGHAN and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 A ship chartered by P.T. Trikora Lloyd ("Trikora") delivered, under bills of lading, to H.F. Staiger Company ("Staiger") a load of rubber contaminated by moisture. Staiger brought an action under the Carriage of Goods by Sea Act ("COGSA"), 42 U.S.C. Sec. 1300 et seq. The district court (MacKenzie, J.) found for Staiger and Trikora now appeals.
 
 
 2
 The issues are: 1) whether Staiger established a prima facie case under COGSA; and 2) whether the district court erred in finding Trikora estopped from proving preloading damage?
 
 
 3
 The district court found the following facts. Staiger, a New York corporation, purchased some 555 pallets of crude rubber from Trikora, an Indonesian corporation. On October 25, 1986, the M/V Trautenbels, chartered by Trikora, loaded the rubber. Trikora issued five bills of lading acknowledging receipt of the pallets in apparent good order and condition with no exceptions.
 
 
 4
 Bill of Lading (BOL) No. 5 covered 250 pallets of SIR 20 rubber. BOL Nos. 3, 4, 13 and 14 covered 305 pallets of lesser quality, brown pressed rubber. The bills of lading were presented by the shipper, P.T. Lingga Djaja, to its bank for payment, and then transferred to Staiger as evidence of title.
 
 
 5
 The crude rubber had been pressed into large blocks, which were then stacked in wooden pallets (or crates). Each individual block had been placed in a light mil polyethylene bag with the open end flapped over, and the whole stack of blocks was covered with a heavier weight polyethylene covering. A wooden cover was placed on top of the crate, and then the entire pallet was secured with steel bands.
 
 
 6
 During the loading on October 25, 1986, officers of the M/V Trautenbels visually inspected the external packaging of each pallet for signs of damage, including exposure to fresh water. The bills of lading, which were issued on the very same day, noted no external signs of damage.
 
 
 7
 Three days later, however, the chief officer signed an exception list prepared by the "Chief Checker" at Palembang, which showed that the packing on some of the crates in BOL No. 3 were broken, and that several crates in BOL Nos. 4, 5, 13 and 14 were wet.
 
 
 8
 On December 16, 1987, while the Trautenbels was still en route to Norfolk, Trikora sent a letter to Staiger, notifying it that the packing of the pallets was of an inferior quality. Enclosed was a copy of a similar letter sent the day before to P.T. Lingga Djaja, which stated that "[w]ith such a condition of the pallets, it will be very easy that damage to the cargo will occur during loading, discharging as well as during voyage to port of destination."
 
 
 9
 The Trautenbels arrived in Norfolk, Virginia, on December 22, 1986, and the pallets of rubber were discharged onto a covered pier at Lamberts Point Docks, Inc. A joint survey was commenced on December 30, 1987, revealing that many of the crates were irregular and had been overpacked, with the result that they had not stacked well and had broken apart during the voyage.
 
 
 10
 It was also discovered that the rubber blocks on many of the pallets showed both mold and the white, "bleaching" discoloration associated with exposure to water. Tests made on the rubber indicated that the damage had been caused by fresh water, most likely rain.
 
 
 11
 On January 6, 1988, a joint condition survey was conducted by Captain Arthur L. Sykes, a marine surveyor representing Staiger's underwriter, Atlantic Mutual Insurance Company, and Colin P. Smith, a marine surveyor representing Trikora. Pallets were chosen from those with evident bleaching, and the blocks of rubber were unloaded and sorted according to those which showed bleaching and those which did not. Several of the damaged blocks were cut open and were found to have internal bleaching as well. Staiger's Vice President, Dennis J. Fenley, testified that the internal discoloration was the result of improper drying during the production process, and that it was common in rubber shipments from Indonesia.
 
 
 12
 On the basis of the joint condition survey, Captain Sykes prepared a depreciation allowance for the shipment of rubber. He determined that a $.04 per pound allowance was the appropriate measurement of depreciation resulting from all of the bleaching uncovered during the survey. For BOL Nos. 3, 4, 13 and 14, he concluded that external wetting represented 70 percent of the depreciation while internal discoloration represented 30 percent. A readjusted allowance of $.028 per pound (70% of $.04 per pound) represented the damage caused by the external wetting alone. For BOL No. 5, no damage was found to have occurred from internal bleaching, and the depreciation allowance for external wetting was kept at $.04 per pound.
 
 
 13
 Smith approved of the depreciation computations, with the exception of the $.04 per pound allowance applied to BOL No. 5, which he felt was too high and should have been closer to the $.028 figure.
 
 
 14
 On December 22, 23 and 26, 1986, Smith performed a hatch survey on the Trautenbels. No evidence of water entry was found in any of the holds where the pallets of rubber had been stored.
 
 
 15
 Staiger filed suit in the United States District Court for the Eastern District of Virginia against Trikora. The complaint invoked the district court's admiralty jurisdiction and sought damages under COGSA. A trial was conducted and the district court found for Staiger in the amount of $33,003.33.
 
 
 16
 Trikora appealed.
 
 
 17
 I. Staiger Established a Prima Facie Case under COGSA
 
 
 18
 To establish a prima facie case under COGSA, Staiger had to show that the crude rubber was delivered to the Trautenbels in good condition, and that the same rubber was damaged upon discharge in Norfolk. Cummins Sales & Services, Inc. v. London & Overseas Insurance Co., 476 F.2d 498, 500 (5th Cir.), cert. denied, 414 U.S. 1003 (1973); Insurance Co. of North America v. Dart Container Line Company, Ltd., 629 F.Supp. 781, 784-85 (E.D.Va.1985). As there is no dispute as to the damaged condition of the cargo on delivery at Norfolk, the sole issue is the condition of the rubber when received by the carrier. The clean bills of lading covering the subject goods, issued by Trikora and introduced by Staiger, were sufficient proof of the cargo's good condition on receipt by the carrier to satisfy the plaintiff's burden of production. See 46 U.S.C. Sec. 1303(3) and 4; Cummins, supra. The district court found on that basis a prima facie case for recovery under COGSA.[1]
 
 
 19
 Trikora has argued that special circumstances exempt the present situation from the normal definition of a prima facie case. Trikora has contended that a bill of lading is insufficient evidence of good condition when the trier of fact is confronted with damage to cargo that cannot be detected by external observation. In Caemint Food, Inc. v. Brasileiro, 647 F.2d 347, 352 (2d Cir.1981), the court observed:
 
 
 20
 Although a clean bill of lading normally constitutes prima facie evidence that cargo was in good condition at the time of shipment, courts have long recognized that it does not have this probative force where, as here, the shipper seeks to recover for damage to goods shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded.
 
 
 21
 See United States v. Lykes Bros. Steamship Co., Inc., 511 F.2d 218, 228 (5th Cir.1975). Trikora further has pointed to other cases where courts have determined goods, and in particular shipments of rubber, were damaged in such a way that a clean bill of lading was inadequate to satisfy the requirements for a prima facie case. See, e.g., Allan C. Grant v. M/V Athos, 86 Civ. 2215 slip op. (S.D.N.Y. June 9, 1987) (water damage to shipment of crude rubber); Tokio Marine & Fire Insurance v. M/V L. Jalabert Bontanq, 624 F.Supp. 402 (S.D.N.Y.1985), aff'd mem., 800 F.2d 1128 (2d Cir.1986) (same).
 
 
 22
 Trikora's reliance on those cases, however, is misplaced. In Grant and Tokio Marine, for example, the courts found the plastic covering placed over the pallets of rubber prevented the carrier from observing any water damage during the inspection. Here, however, the district court found the bleaching of the rubber would have been observable through the plastic covering at a distance of four to eight feet. The court held in its opinion that: "A reasonable inspection of the pallets would have included a visual inspection within this distance."
 
 
 23
 Hence, since the damage was detectable by external observation, the statutes and case law holding a clean bill of lading sufficient for a prima facie case apply fully. There is no need to consider the ramifications of concealed damage. Grant, Tokio Marine, and other cases cited by Trikora are inapposite.
 
 
 24
 Even if the damage was concealed, Trikora might still be bound to the bills of lading. Apart from practical visibility, the district court also found that Trikora was actually aware of obvious external discrepancies, such as wetting and inferior packing, yet chose not to list them as exceptions on the bills of lading. As the court noted, "[a] bill of lading must state the condition of the goods themselves, even if the condition is not externally observable, where the carrier knows or should have known that the goods are damaged." See T.J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 373 n. 82 (5th Cir.1980).[2] Trikora's foreknowledge of evidence indicating damage bound it to the clean bills of lading.
 
 
 25
 As the record does not demonstrate the court's findings of fact are clearly erroneous, see F.R.Civ.P. 52, Trikora's previous knowledge and the susceptibility of the damage to external observation clearly justified Staiger in relying on the clean bills of lading as proof of the condition of the rubber, establishing a prima facie case for recovery.
 
 
 26
 II. The District Court Did Not Err in Finding Trikora Estopped from Proving Pre-Loading Damage.
 
 
 27
 The district court found that Trikora's issuance of clean bills of lading, when it knew that the pallets were wet and packed in an inferior manner, estopped it from rebutting Staiger's prima facie case with evidence of pre-loading water damage. See Daido Line v. Thomas P. Gonzalez Corporation, 299 F.2d 669, 673 n. 9 (9th Cir.1962) (a carrier "is estopped to plead the defense of inherent vice when it has issued clean bills of lading on cargo which showed outward signs of internal damage at the time of shipment"); Cummins, 476 F.2d at 500-501 ("a carrier is estopped from impeaching a clean bill of lading in a suit by one who has given value in reliance on the bill of lading"); Kupfermann v. United States, 227 F.2d 348, 350 (2d Cir.1955). As Trikora offered no other evidence, the district court found for Staiger.
 
 
 28
 Trikora has argued that there is an insufficient nexus between the packing discrepancies and the eventual condition of the cargo, claiming that a substantial number of the contaminated pallets evidenced no external damage and that there was no evidence of causation linking the package discrepancies and the internal moisture contamination.[3] Trikora's argument appears flawed. First, there is an evident connection between poor packaging and wetting on the outside of a pallet and moisture damage within. Cf. Arista v. Export Agent, 1978 AMC 2128 (S.D.N.Y.1978) (defendant not estopped where there is no evident connection between packing discrepancy and internal damage). Second, contrary to Trikora's protestations, all pallets in a single shipment need not be damaged; the shipment need only show external signs of damage sufficiently apparent to the carrier for it to incur a duty to note exceptions on the bills of lading. See Philipp Bros. v. Sabogal, 490 F.Supp. 975 (S.D.N.Y.1980).
 
 
 29
 Finally, the statutory policy underlying reliance on bills of lading is an important one and should not be undermined by allowing a carrier to offer evidence in direct contradiction to knowing misrepresentations in its bills of lading. See, e.g., Daido, 299 F.2d at 673 n. 9; Kupfermann, 227 F.2d at 350.
 
 
 30
 The district court did not err in finding that clean bills of lading, despite knowledge of defects associated with water damage, estopped Trikora from introducing evidence of pre-loading moisture contamination.
 
 The judgment is
 
 31
 AFFIRMED.
 
 
 
 [1]
 Once a prima facie case has been established, the burden shifts to Trikora to:
 Prove either that it exercised due diligence to prevent the damage by properly handling the cargo on a sea-worthy ship, 46 U.S.C.App. Secs. 1303(1) & (2), or that the damage falls within one of COGSA's exceptions set forth in 46 U.S.C.App. Sec. 1304(2).
 Tokio Marine & Fire Ins. v. M/V L. Jalabert Bontang, 624 F.Supp. 402, 408 (S.D.N.Y.1985) (citations omitted), aff'd mem. 800 F.2d 1128 (2d Cir.1986).
 
 
 [2]
 The district court observed:
 The crew of the M/V Trautenbels was aware of the inferior packaging of the rubber crates, and the fact that many of the pallets were wet. These observations were more than enough to put the crew on notice that there was a risk of water damage and that a closer inspection of the cargo was necessary.
 
 
 [3]
 Apparently one logical conclusion Trikora wishes us to draw is that, at most, Trikora should only be liable for those pallets indicating external damage. See generally, The Carso, 53 F.2d 374 (2d Cir.), cert. denied, 284 U.S. 679 (1931)